# PORTUONDO, SUPERINTENDENT, FISHKILL CORRECTIONAL FACILITY *v.* AGARD

No. 98–1170.   Argued November 1, 1999—Decided March 6, 2000

62

Scalia, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Kennedy, and Thomas, JJ., joined. Stevens, J., filed an opinion concurring in the judgment, in which Breyer, J., joined, *post*, p. 76. Ginsburg, J., filed a dissenting opinion, in which Souter, J., joined, *post*, p. 76.

*Andrew A. Zwerling* argued the cause for petitioner. With him on the briefs were *Richard A. Brown, John M. Castellano,* and *Ellen C. Abbot.*

*Jonathan E. Nuechterlein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney*

*General Robinson, Deputy Solicitor General Dreeben,* and *Deborah Watson.*

*Beverly Van Ness* argued the cause and filed a brief for respondent.*

JUSTICE SCALIA delivered the opinion of the Court.

In this case we consider whether it was constitutional for a prosecutor, in her summation, to call the jury's attention to the fact that the defendant had the opportunity to hear all other witnesses testify and to tailor his testimony accordingly.

I

Respondent's trial on 19 sodomy and assault counts and 3 weapons counts ultimately came down to a credibility determination. The alleged victim, Nessa Winder, and her friend, Breda Keegan, testified that respondent physically assaulted, raped, and orally and anally sodomized Winder, and that he threatened both women with a handgun. Respondent testified that he and Winder had engaged in consensual vaginal intercourse. He further testified that during an argument he had with Winder, he struck her once in the face. He denied raping her or threatening either woman with a handgun.

During summation, defense counsel charged Winder and Keegan with lying. The prosecutor similarly focused on the credibility of the witnesses. She stressed respondent's interest in the outcome of the trial, his prior felony conviction, and his prior bad acts. She argued that respondent was a "smooth slick character . . . who had an answer for every-

---

*Briefs of *amici curiae* urging reversal were filed for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson;* and for the New York State District Attorneys Association by *William J. Fitzpatrick, Steven A. Hovani,* and *Michael J. Miller.*

*Deanne E. Maynard* and *Lisa Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

thing," App. 45, and that part of his testimony "sound[ed] rehearsed," *id.*, at 48. Finally, over defense objection, the prosecutor remarked:

> "You know, ladies and gentlemen, unlike all the other witnesses in this case the defendant has a benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to the testimony of all the other witnesses before he testifies.
>
> .        .        .        .        .
>
> "That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence?
>
> .        .        .        .        .
>
> "He's a smart man. I never said he was stupid. . . . He used everything to his advantage." *Id.*, at 49.

The trial court rejected defense counsel's claim that these last comments violated respondent's right to be present at trial. The court stated that respondent's status as the last witness in the case was simply a matter of fact, and held that his presence during the entire trial, and the advantage that this afforded him, "may fairly be commented on." *Id.*, at 54.

Respondent was convicted of one count of anal sodomy and two counts of third-degree possession of a weapon. On direct appeal, the New York Supreme Court reversed one of the convictions for possession of a weapon but affirmed the remaining convictions. *People* v. *Agard,* 199 App. Div. 2d 401, 606 N. Y. S. 2d 239 (2d Dept. 1993). The New York Court of Appeals denied leave to appeal. *People* v. *Agard,* 83 N. Y. 2d 868, 635 N. E. 2d 298 (1994).

Respondent then filed a petition for habeas corpus relief in federal court, claiming, *inter alia,* that the prosecutor's comments violated his Fifth and Sixth Amendment rights to be present at trial and confront his accusers. He further claimed that the comments violated his Fourteenth Amend-

ment right to due process. The District Court denied the petition in an unpublished order. A divided panel of the Second Circuit reversed, holding that the prosecutor's comments violated respondent's Fifth, Sixth, and Fourteenth Amendment rights. 117 F. 3d 696 (1997), rehearing denied, 159 F. 3d 98 (1998). We granted certiorari. 526 U. S. 1016 (1999).

## II

Respondent contends that the prosecutor's comments on his presence and on the ability to fabricate that it afforded him unlawfully burdened his Sixth Amendment right to be present at trial and to be confronted with the witnesses against him, see *Illinois* v. *Allen,* 397 U. S. 337 (1970); *Pointer* v. *Texas,* 380 U. S. 400 (1965), and his Fifth and Sixth Amendment rights to testify on his own behalf, see *Rock* v. *Arkansas,* 483 U. S. 44 (1987). Attaching the cost of impeachment to the exercise of these rights was, he asserts, unconstitutional.

Respondent's argument boils down to a request that we extend to comments of the type the prosecutor made here the rationale of *Griffin* v. *California,* 380 U. S. 609 (1965), which involved comments upon a defendant's *refusal* to testify. In that case, the trial court instructed the jury that it was free to take the defendant's failure to deny or explain facts within his knowledge as tending to indicate the truth of the prosecution's case. This Court held that such a comment, by "solemniz[ing] the silence of the accused into evidence against him," unconstitutionally "cuts down on the privilege [against self-incrimination] by making its assertion costly." *Id.,* at 614.

We decline to extend *Griffin* to the present context. As an initial matter, respondent's claims have no historical foundation, neither in 1791, when the Bill of Rights was adopted, nor in 1868 when, according to our jurisprudence, the Fourteenth Amendment extended the strictures of the Fifth and Sixth Amendments to the States. The process by which

criminal defendants were brought to justice in 1791 largely obviated the need for comments of the type the prosecutor made here. Defendants routinely were asked (and agreed) to provide a pretrial statement to a justice of the peace detailing the events in dispute. See Moglen, The Privilege in British North America: The Colonial Period to the Fifth Amendment, in The Privilege Against Self-Incrimination 109, 112, 114 (R. Helmholz et al. eds. 1997). If their story at trial—where they typically spoke and conducted their defense personally, without counsel, see J. Goebel & T. Naughton, Law Enforcement in Colonial New York: A Study in Criminal Procedure (1664–1776), p. 574 (1944); A. Scott, Criminal Law in Colonial Virginia 79 (1930)—differed from their pretrial statement, the contradiction could be noted. See Levy, Origins of the Fifth Amendment and Its Critics, 19 Cardozo L. Rev. 821, 843 (1997). Moreover, what they said at trial was not considered to be evidence, since they were disqualified from testifying under oath. See 2 J. Wigmore, Evidence § 579 (3d ed. 1940).

The pretrial statement did not begin to fall into disuse until the 1830's, see Alschuler, A Peculiar Privilege in Historical Perspective, in The Privilege Against Self-Incrimination, *supra,* at 198, and the first State to make defendants competent witnesses was Maine, in 1864, see 2 Wigmore, *supra,* § 579, at 701. In response to these developments, some States attempted to limit a defendant's opportunity to tailor his sworn testimony by requiring him to testify prior to his own witnesses. See 3 J. Wigmore, Evidence §§ 1841, 1869 (1904); Ky. Stat., ch. 45, § 1646 (1899); Tenn. Code Ann., ch. 4, § 5601 (1896). Although the majority of States did not impose such a restriction, there is no evidence to suggest they also took the affirmative step of forbidding comment upon the defendant's opportunity to tailor his testimony. The dissent faults us for "call[ing] up no instance of an 18th- or 19th-century prosecutor's urging that a defendant's presence at trial facilitated tailored testimony." *Post,*

at 84 (opinion of GINSBURG, J.). We think the burden is rather upon respondent and the dissent, who assert the unconstitutionality of the practice, to come up with a case in which such urging was held improper. They cannot even produce one in which the practice was so much as *challenged* until after our decision in *Griffin*. See, *e. g., State* v. *Cassidy*, 236 Conn. 112, 126–127, 672 A. 2d 899, 907–908 (1996); *People* v. *Buckey*, 424 Mich. 1, 8–15, 378 N. W. 2d 432, 436–439 (1985); *Jenkins* v. *United States*, 374 A. 2d 581, 583–584 (D. C. 1977). This absence cuts in favor of respondent (as the dissent asserts) only if it is possible to believe that after reading *Griffin* prosecutors suddenly realized that commenting on a testifying defendant's unique ability to hear prior testimony was a *good* idea. Evidently, prosecutors were making these comments all along without objection; *Griffin* simply sparked the notion that such commentary *might* be problematic.

Lacking any historical support for the constitutional rights that he asserts, respondent must rely entirely upon our opinion in *Griffin*. That case is a poor analogue, however, for several reasons. What we prohibited the prosecutor from urging the jury to do in *Griffin* was something *the jury is not permitted to do.* The defendant's right to hold the prosecution to proving its case without his assistance is not to be impaired by the jury's counting the defendant's silence at trial against him—and upon request the court must instruct the jury to that effect. See *Carter* v. *Kentucky*, 450 U. S. 288 (1981). It is reasonable enough to expect a jury to comply with that instruction since, as we observed in *Griffin*, the inference of guilt from silence is not always "natural or irresistible." 380 U. S., at 615. A defendant might refuse to testify simply out of fear that he will be made to look bad by clever counsel, or fear "'that his prior convictions will prejudice the jury.'" *Ibid.* (quoting *People* v. *Modesto*, 62 Cal. 2d 436, 453, 398 P. 2d 753, 763 (1965) (en banc)). By contrast, it *is* natural and irresistible for a jury, in evaluating

the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him. It is one thing (as *Griffin* requires) for the jury to evaluate all the *other* evidence in the case without giving any effect to the defendant's refusal to testify; it is something else (and quite impossible) for the jury to evaluate the credibility of the defendant's testimony while blotting out from its mind the fact that before giving the testimony the defendant had been sitting there listening to the other witnesses. Thus, the principle respondent asks us to adopt here differs from what we adopted in *Griffin* in one or the other of the following respects: It either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible.[1]

---

[1] The dissent seeks to place us in the position of defending the proposition that inferences that the jury is free to make are inferences that the prosecutor must be free to invite. *Post*, at 86–87. Of course we say no such thing. We simply say (in the sentence to which this note is appended) that forbidding invitation of a *permissible* inference is one of two alternative respects in which this case is substantially different from respondent's sole source of support, *Griffin*. Similarly, the dissent seeks to place us in the position of defending the proposition that it is more natural to infer tailoring from presence than to infer guilt from silence. *Post*, at 84–86. The quite different point we do make is that inferring *opportunity to tailor* from presence is inevitable, and prohibiting that inference (while simultaneously asking the jury to evaluate the veracity of the defendant's testimony) is demanding the impossible—producing the other alternative respect in which this case differs from *Griffin*.

The dissent seeks to rebut this point by asserting that in the present case the prosecutorial comments went beyond pointing out the opportunity to tailor and actually made an accusation of tailoring. It would be worth inquiring into that subtle distinction if the dissent proposed to permit the former while forbidding the latter. It does not, of course; nor, as far as we know, does any other authority. Drawing the line between pointing out the availability of the inference and inviting the inference would be neither useful nor practicable. Thus, under the second alternative described above, the jury must be prohibited from taking into account the opportunity of tailoring.

Second, *Griffin* prohibited comments that suggest a defendant's silence is "evidence of *guilt.*" 380 U. S., at 615 (emphasis added); see also *United States* v. *Robinson,* 485 U. S. 25, 32 (1988) ("*'Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt'" (quoting *Baxter* v. *Palmigiano,* 425 U. S. 308, 319 (1976))). The prosecutor's comments in this case, by contrast, concerned respondent's *credibility as a witness,* and were therefore in accord with our longstanding rule that when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown* v. *United States,* 356 U. S. 148, 154 (1958). "[W]hen [a defendant] assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." *Perry* v. *Leeke,* 488 U. S. 272, 282 (1989). See also *Reagan* v. *United States,* 157 U. S. 301, 305 (1895).

Respondent points to our opinion in *Geders* v. *United States,* 425 U. S. 80, 87–91 (1976), which held that the defendant must be treated differently from other witnesses insofar as sequestration orders are concerned, since sequestration for an extended period of time denies the Sixth Amendment right to counsel. With respect to issues of credibility, however, no such special treatment has been accorded. *Jenkins* v. *Anderson,* 447 U. S. 231 (1980), illustrates the point. There the prosecutor in a first-degree murder trial, during cross-examination and again in closing argument, attempted to impeach the defendant's claim of self-defense by suggesting that he would not have waited two weeks to report the killing if that was what had occurred. In an argument strikingly similar to the one presented here, the defendant in *Jenkins* claimed that commenting on his prearrest silence violated his Fifth Amendment privilege against self-incrimination because "a person facing arrest will not remain silent if his failure to speak later can be used to impeach

him." *Id.*, at 236. The Court noted that it was not clear whether the Fifth Amendment protects prearrest silence, *id.*, at 236, n. 2, but held that, *assuming it does*, the prosecutor's comments were constitutionally permissible. "[T]he Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Id.*, at 236 (quoting *Chaffin* v. *Stynchcombe*, 412 U. S. 17, 30 (1973)). Once a defendant takes the stand, he is "'subject to cross-examination impeaching his credibility just like any other witness.'" *Jenkins, supra,* at 235–236 (quoting *Grunewald* v. *United States,* 353 U. S. 391, 420 (1957)).

Indeed, in *Brooks* v. *Tennessee,* 406 U. S. 605 (1972), the Court suggested that arguing credibility to the jury—which would include the prosecutor's comments here—is the preferred means of counteracting tailoring of the defendant's testimony. In that case, the Court found unconstitutional Tennessee's attempt to defeat tailoring by requiring defendants to testify at the outset of the defense or not at all. This requirement, it said, impermissibly burdened the defendant's right to testify because it forced him to decide whether to do so before he could determine that it was in his best interest. *Id.*, at 610. The Court expressed its awareness, however, of the danger that tailoring presented. The antidote, it said, was not Tennessee's heavy-handed rule, but the more nuanced "adversary system[, which] reposes judgment of the credibility of all witnesses in the jury." *Id.*, at 611. The adversary system surely envisions—indeed, it requires—that the prosecutor be allowed to bring to the jury's attention the danger that the Court was aware of.

Respondent and the dissent also contend that the prosecutor's comments were impermissible because they were "generic" rather than based upon any specific indication of tailoring. Such comment, the dissent claims, is unconstitutional because it "does not serve to distinguish guilty defendants from innocent ones." *Post,* at 77. But this Court has

approved of such "generic" comment before. In *Reagan*, for example, the trial court instructed the jury that "[t]he deep personal interest which [the defendant] may have in the result of the suit should be considered . . . in weighing his evidence and in determining how far or to what extent, if at all, it is worthy of credit." 157 U. S., at 304. The instruction did not rely on any specific evidence of actual fabrication for its application; nor did it, directly at least, delineate the guilty and the innocent. Like the comments in this case, it simply set forth a consideration the jury was to have in mind when assessing the defendant's credibility, which, *in turn*, assisted it in determining the guilt of the defendant. We deemed that instruction perfectly proper. Thus, that the comments before us here did not, of their own force, demonstrate the guilt of the defendant, or even distinguish among defendants, does not render them infirm.[2]

Finally, the Second Circuit held, and the dissent contends, that the comments were impermissible here because they were made, not during cross-examination, but at summation,

---

[2] The dissent's stern disapproval of generic comment (it "tarnishes the innocent no less than the guilty," *post*, at 77–78; it suffers from an "incapacity to serve the individualized truth-finding function of trials," *post*, at 80; so that "when a defendant's exercise of a constitutional fair trial right is 'insolubly ambiguous' as between innocence and guilt, the prosecutor may not urge the jury to construe the bare invocation of the right against the defendant," *post*, at 78) hardly comports with its praising the Court of Appeals for its "carefully restrained and moderate position" in forbidding this monstrous practice only on summation and allowing it during the rest of the trial, *ibid*. The dissent would also allow a prosecutor to remark at any time—even at summation—on the convenient "fit" between specific elements of a defendant's testimony and the testimony of others. *Ibid*. It is only a "general accusation of tailoring" that is forbidden. *Ibid*. But if the dissent believes that comments which "invite the jury to convict on the basis of conduct as consistent with innocence as with guilt" should be out of bounds, *post*, at 79—or at least should be out of bounds in summation—comments focusing on such "fit" must similarly be forbidden. As the dissent acknowledges, "fit" is as likely to result from the defendant's "sheer innocence" as from anything else. *Post*, at 85.

leaving the defense no opportunity to reply. 117 F. 3d, at 708, and n. 6. That this is not a constitutionally significant distinction is demonstrated by our decision in *Reagan*. There the challenged instruction came at the end of the case, after the defense had rested, just as the prosecutor's comments did here.[3]

Our trial structure, which requires the defense to close before the prosecution, regularly forces the defense to predict what the prosecution will say. Indeed, defense counsel in this case explained to the jury that it was his job in "closing argument here to try and anticipate as best [he could] some of the arguments that the prosecution [would] be making." App. 25–27. What *Reagan* permitted—a generic

---

[3] The dissent maintains that *Reagan* v. *United States*, 157 U. S. 301 (1895), is inapposite to the question presented in this case because it considered the effect of an interested-witness instruction on a defendant's *statutory* right to testify, rather than on his *constitutional* right to testify. See *id.*, at 304 (citing Act of Mar. 16, 1878, ch. 37, 20 Stat. 30, as amended, 18 U. S. C. § 3481). That is a curious position for the dissent to take. *Griffin*—the case the dissent claims controls the outcome here—relied almost exclusively on the very statute at issue in *Reagan* in defining the contours of the Fifth Amendment right prohibiting comment on the failure to testify. After quoting the Court's description, in an earlier case, of the reasons for the statutory right, see *Wilson* v. *United States*, 149 U. S. 60 (1893), the *Griffin* Court said: "If the words 'Fifth Amendment' are substituted for 'act' and for 'statute,' the spirit of the Self-Incrimination Clause is reflected." 380 U. S., at 613–614. It is eminently reasonable to consider that a questionable manner of constitutional exegesis, see *Mitchell* v. *United States*, 526 U. S. 314, 336 (1999) (SCALIA, J., dissenting); it is not reasonable to make *Griffin* the very centerpiece of one's case while simultaneously denying that the statute construed in *Reagan* (and *Griffin*) has anything to do with the meaning of the Constitution. The interpretation of the statute in *Reagan* is in fact a much *more* plausible indication of constitutional understanding than the application of the statute in *Griffin:* The Constitution must have allowed what *Reagan* said the statute permitted, because otherwise the Court would have been interpreting the statute in a manner that rendered it void. *Griffin*, on the other hand, relied upon the much shakier proposition that a practice which the statute *prohibited* must be prohibited by the Constitution as well.

interested-witness instruction, *after the defense has closed*—is in a long tradition that continues to the present day. See, *e. g., United States* v. *Jones,* 587 F. 2d 802 (CA5 1979); *United States* v. *Hill,* 470 F. 2d 361 (CADC 1972); 2 C. Wright, Federal Practice and Procedure § 501, and n. 1 (1982). Indeed, the instruction was given in this very case. See Tr. 834 ("A defendant is of course an interested witness since he is interested in the outcome of the trial. You may as jurors wish to keep such interest in mind in determining the credibility and weight to be given to the defendant's testimony").[4] There is absolutely nothing to support the dissent's contention that for purposes of determining the validity of generic attacks upon credibility "the distinction between cross-examination and summation is critical," *post,* at 87.

In sum, we see no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate—and indeed, given the inability to sequester the defendant, sometimes essential—to the central function of the trial, which is to discover the truth.

---

[4] It is hard to understand how JUSTICE STEVENS reconciles the unquestionable propriety of the standard interested-witness instruction with his conclusion that comment upon the opportunity to tailor, although it is constitutional, "demean[s] [the adversary] process" and "should be discouraged." *Post,* at 76 (opinion concurring in judgment). Our decision, in any event, is addressed to whether the comment is permissible as a constitutional matter, and not to whether it is always desirable as a matter of sound trial practice. The latter question, as well as the desirability of putting prosecutorial comment into proper perspective by judicial instruction, are best left to trial courts, and to the appellate courts which routinely review their work.

74

## III

Finally, we address the Second Circuit's holding that the prosecutor's comments violated respondent's Fourteenth Amendment right to due process. Of course to the extent this claim is based upon alleged burdening of Fifth and Sixth Amendment rights, it has already been disposed of by our determination that those Amendments were not infringed. Cf. *Graham* v. *Connor*, 490 U. S. 386, 395 (1989) (where an Amendment "provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims").

Respondent contends, however, that because New York law required him to be present at his trial, see N. Y. Crim. Proc. Law § 260.20 (McKinney 1993); N. Y. Crim. Proc. Law § 340.50 (McKinney 1994), the prosecution violated his right to due process by commenting on that presence. He asserts that our decision in *Doyle* v. *Ohio*, 426 U. S. 610 (1976), requires such a holding. In *Doyle*, the defendants, after being arrested for selling marijuana, received their *Miranda* warnings and chose to remain silent. At their trials, both took the stand and claimed that they had not sold marijuana, but had been "framed." 426 U. S., at 613. To impeach the defendants, the prosecutors asked each why he had not related this version of events at the time he was arrested. We held that this violated the defendants' rights to due process because the *Miranda* warnings contained an implicit "assurance that silence will carry no penalty." 426 U. S., at 618.

Although there might be reason to reconsider *Doyle*, we need not do so here. "[W]e have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." *Fletcher* v. *Weir*, 455 U. S. 603, 606 (1982) *(per curiam)*. The *Miranda* warnings had, after all, specifically given the defendant both the option of speaking and the option of remaining silent—and had then gone

on to say that if he chose the former option what he said could be used against him. It is possible to believe that this contained an implicit promise that his choice of the option of silence would *not* be used against him. It is not possible, we think, to believe that a similar promise of impunity is implicit in a statute requiring the defendant to be present at trial.

Respondent contends that this case contains an element of unfairness even worse than what existed in *Doyle:* Whereas the defendant in that case had the ability to avoid impairment of his case by choosing to speak rather than remain silent, the respondent here (he asserts) had no choice but to be present at the trial. Though this is far from certain, see, *e. g., People* v. *Aiken,* 45 N. Y. 2d 394, 397, 380 N. E. 2d 272, 274 (1978) ("[A] defendant charged with a felony not punishable by death may, by his voluntary and willful absence from trial, waive his right to be present at every stage of his trial"), we shall assume for the sake of argument that it is true. There is, however, no authority whatever for the proposition that the impairment of credibility, if any, caused by mandatory presence at trial violates due process. If the ability to avoid the accusation (or suspicion) of tailoring were as crucial a factor as respondent contends, one would expect criminal defendants—in jurisdictions that do not have compulsory attendance requirements—frequently to absent themselves from trial when they intend to give testimony. But to our knowledge, a criminal trial without the defendant present is a rarity. Many long established elements of criminal procedure deprive a defendant of advantages he would otherwise possess—for example, the requirement that he plead to the charge before, rather than after, all the evidence is in. The consequences of the requirement that he be present at trial seem to us no worse.

\*    \*    \*

For the foregoing reasons, the judgment of the Court of Appeals for the Second Circuit is reversed, and the case

is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BREYER joins, concurring in the judgment.

While I am not persuaded that the prosecutor's summation crossed the high threshold that separates trial error—even serious trial error—from the kind of fundamental unfairness for which the Constitution requires that a state criminal conviction be set aside, cf. *Rose* v. *Lundy,* 455 U. S. 509, 543–544 (1982), I must register my disagreement with the Court's implicit endorsement of her summation.

The defendant's Sixth Amendment right "to be confronted with the witnesses against him" serves the truth-seeking function of the adversary process. Moreover, it also reflects respect for the defendant's individual dignity and reinforces the presumption of innocence that survives until a guilty verdict is returned. The prosecutor's argument in this case demeaned that process, violated that respect, and ignored that presumption. Clearly such comment should be discouraged rather than validated.

The Court's final conclusion, which I join, that the argument survives constitutional scrutiny does not, of course, deprive States or trial judges of the power either to prevent such argument entirely or to provide juries with instructions that explain the necessity, and the justifications, for the defendant's attendance at trial.

Accordingly, although I agree with much of what JUSTICE GINSBURG has written, I concur in the Court's judgment.

JUSTICE GINSBURG, with whom JUSTICE SOUTER joins, dissenting.

The Court today transforms a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility. I dissent from the Court's disposition. In

*Griffin* v. *California*, 380 U. S. 609 (1965), we held that a defendant's refusal to testify at trial may not be used as evidence of his guilt. In *Doyle* v. *Ohio*, 426 U. S. 610 (1976), we held that a defendant's silence after receiving *Miranda* warnings did not warrant a prosecutor's attack on his credibility. Both decisions stem from the principle that where the exercise of constitutional rights is "insolubly ambiguous" as between innocence and guilt, *id.*, at 617, a prosecutor may not unfairly encumber those rights by urging the jury to construe the ambiguity against the defendant.

The same principle should decide this case. Ray Agard attended his trial, as was his constitutional right and his statutory duty, and he testified in a manner consistent with other evidence in the case. One evident explanation for the coherence of his testimony cannot be ruled out: Agard may have been telling the truth. It is no more possible to know whether Agard used his presence at trial to figure out how to tell potent lies from the witness stand than it is to know whether an accused who remains silent had no exculpatory story to tell.

The burden today's decision imposes on the exercise of Sixth Amendment rights is justified, the Court maintains, because "the central function of the trial . . . is to discover the truth." See *ante*, at 73. A trial ideally is a search for the truth, but I do not agree that the Court's decision advances that search. The generic accusation that today's decision permits the prosecutor to make on summation does not serve to distinguish guilty defendants from innocent ones. Every criminal defendant, guilty or not, has the right to attend his trial. U. S. Const., Amdt. 6. Indeed, as the Court grants, *ante*, at 74, New York law *requires* defendants to be present when tried. It follows that every defendant who testifies is equally susceptible to a generic accusation about his opportunity for tailoring. The prosecutorial comment at issue, tied only to the defendant's presence in the courtroom and not to his actual testimony, tarnishes the innocent no

less than the guilty. Nor can a jury measure a defendant's credibility by evaluating the defendant's response to the accusation, for the broadside is fired after the defense has submitted its case. An irrebuttable observation that can be made about any testifying defendant cannot sort those who tailor their testimony from those who do not, much less the guilty from the innocent.

## I

The Court of Appeals took a carefully restrained and moderate position in this case. It held that a prosecutor may not, as part of her summation, use the mere fact of a defendant's presence at his trial as the basis for impugning his credibility. A prosecutor who wishes at any stage of a trial to accuse a defendant of tailoring specific elements of his testimony to fit with particular testimony given by other witnesses would, under the decision of the Court of Appeals, have leave to do so. See 159 F. 3d 98, 99 (CA2 1998). Moreover, on cross-examination, a prosecutor would be free to challenge a defendant's overall credibility by pointing out that the defendant had the opportunity to tailor his testimony in general, even if the prosecutor could point to no facts suggesting that the defendant had actually engaged in tailoring. See 117 F. 3d 696, 708, n. 6 (CA2 1997). The Court of Appeals held only that the prosecutor may not launch a general accusation of tailoring on summation. See id., at 709; see also United States v. Chacko, 169 F. 3d 140, 150 (CA2 1999). Thus, the decision below would rein in a prosecutor solely in situations where there is no particular reason to believe that tailoring has occurred and where the defendant has no opportunity to rebut the accusation.

The Court of Appeals' judgment was correct in light of Griffin and Doyle. Those decisions instruct that when a defendant's exercise of a constitutional fair trial right is "insolubly ambiguous" as between innocence and guilt, the prosecutor may not urge the jury to construe the bare invocation of the right against the defendant. See Doyle, 426 U. S., at

617.  To be sure, defendants are not categorically exempt from some costs associated with the assertion of their constitutional prerogatives.  The Court is correct to say that the truth-seeking function of trials places demands on defendants.  In a proper case, that central function could justify a particular burden on the exercise of Sixth Amendment rights.  But the interests of truth are not advanced by allowing a prosecutor, at a time when the defendant cannot respond, to invite the jury to convict on the basis of conduct as consistent with innocence as with guilt.  Where burdening a constitutional right will not yield a compensating benefit, as in the present case, there is no justification for imposing the burden.

The truth-seeking function of trials may be served by permitting prosecutors to make accusations of tailoring—even wholly generic accusations of tailoring—as part of cross-examination.  Some defendants no doubt do give false testimony calculated to fit with the testimony they hear from other witnesses.  If accused on cross-examination of having tailored their testimony, those defendants might display signals of untrustworthiness that it is the province of the jury to detect and interpret.  But when a generic argument is offered on summation, it cannot in the slightest degree distinguish the guilty from the innocent.  It undermines all defendants equally and therefore does not help answer the question that is the essence of a trial's search for truth: Is this particular defendant lying to cover his guilt or truthfully narrating his innocence?[1]

---

[1] The prosecutor made the following comment on summation: "A lot of what [the defendant] told you corroborates what the complaining witnesses told you.  The only thin[g] that doesn't is the denials of the crimes.  Everything else fits perfectly." App. 46–47.  That, according to the prosecution, is reason for the jury to be suspicious that the defendant falsely tailored his testimony.  The implication of this argument seems to be that the more a defendant's story hangs together, the more likely it is that he is lying.  To claim that such an argument helps find truth at trial is to step completely through the looking glass.

In addition to its incapacity to serve the individualized truth-finding function of trials, a generic tailoring argument launched on summation entails the simple unfairness of preventing a defendant from answering the charge. This problem was especially pronounced in the instant case. Under New York law, defendants generally may not bolster their own credibility by introducing their prior consistent statements but may introduce such statements to rebut claims of recent fabrication. See *People* v. *McDaniel*, 81 N. Y. 2d 10, 16, 611 N. E. 2d 265, 268 (1993); 117 F. 3d, at 715 (Winter, C. J., concurring). Had the prosecution made its tailoring accusations on cross-examination, Agard might have been able to prove that his story at trial was the same as it had been before he heard the testimony of other witnesses. A prosecutor who can withhold a tailoring accusation until summation can avert such a rebuttal.

The Court's only support for its choice to ignore the distinction between summation and cross-examination is *Reagan* v. *United States*, 157 U. S. 301 (1895), a decision which, by its very terms, does not bear on today's constitutional controversy. It is true, as the Court says, that *Reagan* upheld a trial judge's instruction that questioned the credibility of a testifying defendant in a generic manner, and it is also true that a defendant is no more able to respond to an instruction than to a prosecutor's summation. But *Reagan* has no force as precedent for this case because, in the 1895 Court's view, the instruction there at issue did not burden any constitutional right of the defendant.

The trial court in *Reagan* instructed the jury that when it evaluated the credibility of the defendant's testimony, it could consider that defendants have a powerful interest in being acquitted, powerful enough that it might induce some people to lie. See *id.*, at 304–305. This instruction burdened the defendant's right to testify at his own trial. But the Court that decided *Reagan* conceived of that right as one dependent on a statute, not on any constitutional prescrip-

tion.  See *id.*, at 304 (defendant was qualified to testify under oath pursuant to an 1878 Act of Congress, ch. 37, 20 Stat. 30, which removed the common-law disability that had previously prevented defendants from giving sworn testimony).   No one in that 19th-century case suggested that the trial court's comment exacted a penalty for the exercise of any constitutional right.[2]   It is thus inaccurate for the Court to portray *Reagan* as precedent for the proposition that the difference between summation and cross-examination "is not a constitutionally significant distinction."  *Ante,* at 72. *Reagan* made no determination of constitutional significance or insignificance, for it addressed no constitutional question.

The Court endeavors to bring *Reagan* within constitutional territory by yoking it to *Griffin.*   The Court asserts that *Griffin* relied on the very statute that defined the rights of the defendant in *Reagan* and that *Griffin's* holding makes sense only if the statute in *Reagan* carries constitutional implications.   *Ante,* at 72, n. 3.   This argument is flawed in its premise, because *Griffin* rested solidly on the Fifth Amendment.   The Court in *Griffin* did refer to the 1878 statute at issue in *Reagan,* but it did so only in connection with its discussion of *Wilson* v. *United States,* 149 U. S. 60 (1893), a decision construing a different provision of that statute to prohibit federal prosecutors from commenting to juries on defendants' failure to testify.   See *Griffin,* 380 U. S., at 612–613.   The statute at issue in *Reagan* and *Wilson,* now codified at 18 U. S. C. §3481, provides that defendants in criminal trials have both the right to testify and the right not

---

[2] The offense charged in *Reagan* was, moreover, a misdemeanor rather than a felony.  See 157 U. S., at 304.  Even today, our cases recognize a distinction between serious and petty crimes, and we have held that some provisions of the Sixth Amendment do not apply in petty prosecutions. See, *e. g., Lewis* v. *United States,* 518 U. S. 322 (1996) (right to jury trial does not attach in trials for petty offenses).   The *Reagan* Court classified the case before it as belonging to the less serious category of offenses and explicitly denied the defendant the heightened procedural protections that attached in trials for more serious crimes.  See 157 U. S., at 302–304.

to testify. *Reagan* concerned the former right, *Wilson* the latter right, and *Griffin* the constitutional analogue to the latter right. If the Court in *Griffin* had regarded the statute as settling the meaning of the Fifth Amendment—an odd position to imagine the Court taking—then it could have rested on *Wilson*. It did not. It said that *Wilson* would govern were the question presented a statutory one, but that the question before it was constitutional: "The question remains whether, *statute or not*, the comment . . . violates the Fifth Amendment." 380 U. S., at 613 (emphasis added). Thus, the question in *Griffin* was not controlled by *Wilson* precisely because the statute construed in *Wilson* and *Reagan* was just that—a statute—and not a provision of the Constitution. Accordingly, *Griffin* provides no support for the Court's unorthodox contention that *Reagan*'s statutory holding was actually of constitutional dimension.[3]

## II

The Court offers two arguments in support of its conclusion that a prosecutor may make the generic tailoring accusations at issue in this case. First, it suggests that such comment has historically not been seen as problematic.

---

[3] I do not question the constitutionality of an instruction in which a trial court generally advises the jury that in evaluating the credibility of witnesses, it may take account of the interest of any witness, including the defendant, in the outcome of a case. The interested-witness instruction given in Agard's case was of this variety. The trial court first told the jury that it should consider the interest that any interested witness might have in the outcome. See Tr. 834 ("If you find that any witness is an interested witness, you should consider such interest in determining the credibility of that person's testimony and the weight to be given to it."). It then went on to note, as the Court reports, *ante*, at 73, that the defendant is an interested witness. See Tr. 834. Any instruction generally applicable to witnesses will affect defendants who testify, just as the rules governing the admissibility of testimony at trial will restrict defendants' testimony as they do the testimony of other witnesses. It is a far different matter for an instruction or an argument to impose unique burdens on defendants.

Second, it contends that respondent Agard's case is readily distinguishable from *Griffin*. The Court's historical excursus does not even begin to prove that comments like those in this case have ever been accepted as constitutional, and the attempt to distinguish *Griffin* relies on implausible premises that this Court has previously rejected.

The Court's historical narrative proceeds as follows: In the early days of the Republic, prosecutors had no "need" to suggest that defendants might use their presence at trial to tailor their testimony, because defendants' (unsworn) statements at trial could be compared with pretrial statements that defendants gave as a matter of course. Later, some States instituted rules requiring defendants to testify before the other witnesses did,[4] thus obviating once again any need to make arguments about tailoring. There is no evidence, the Court says, that any State ever prohibited the kind of generic argument now at issue until recent times.[5] So it must be the case that generic tailoring arguments have traditionally been thought unproblematic. *Ante*, at 65–66.

---

[4] In *Brooks* v. *Tennessee*, 406 U. S. 605 (1972), we held this practice unconstitutional under the Fifth and Fourteenth Amendments.

[5] In recent years, several state courts have found it improper for prosecutors to make accusations of tailoring based on the defendant's constant attendance at trial. See, *e. g., State* v. *Cassidy*, 236 Conn. 112, 672 A. 2d 899 (1996); *State* v. *Jones*, 580 A. 2d 161, 163 (Me. 1990); *Hart* v. *United States*, 538 A. 2d 1146, 1149 (D. C. 1988); *State* v. *Hemingway*, 148 Vt. 90, 91–92, 528 A. 2d 746, 747–748 (1987); *Commonwealth* v. *Person*, 400 Mass. 136, 138–142, 508 N. E. 2d 88, 90–92 (1987); *State* v. *Johnson*, 80 Wash. App. 337, 908 P. 2d 900 (1996). In *Commonwealth* v. *Elberry*, 38 Mass. App. 912, 645 N. E. 2d 41 (1995), the trial judge sustained defense counsel's objection to a prosecutor's tailoring argument that burdened the defendant's right to be present at trial and issued the following curative instruction: "Of course, the defendant, who was a witness in this case, was here during the testimony of other witnesses, but he's got every right to be here, too. . . . [Y]ou should take everything into consideration in determining credibility, but there is nothing untoward about the defendant being present when other witnesses are testifying." *Id.*, at 913, 645 N. E. 2d, at 43.

I do not comprehend why the Court finds in this account any demonstration that the prosecutorial comment at issue here has a long history of unchallenged use. If prosecutors in times past had no need to make generic tailoring arguments, it is likely such arguments simply were not made. Notably, the Court calls up no instance of an 18th- or 19th-century prosecutor's urging that a defendant's presence at trial facilitated tailored testimony. And if prosecutors did not make such arguments, courts had no occasion to rule them out of order. The absence of old cases prohibiting the comment that the Court now confronts thus scarcely indicates that generic accusations of tailoring have long been considered constitutional.

The Court's discussion of *Griffin* is equally unconvincing. The Court posits that a ban on inviting juries to draw adverse inferences from a defendant's *silence* differs materially from a ban on inviting juries to draw adverse inferences from a defendant's *presence*, because the inference from silence "is not . . . 'natural or irresistible.'" See *ante*, at 67 (quoting *Griffin*, 380 U. S., at 615) (emphasis added by majority). This is a startling statement. It fails to convey what the Court actually said in *Griffin*, which was that the inference from silence to guilt is "not *always* so natural or irresistible." See *ibid.* (emphasis added). The statement that an inference is not *always* natural or irresistible implies that the inference is indeed natural or irresistible in many, perhaps most, cases. And so it is. See *Mitchell* v. *United States*, 526 U. S. 314, 332 (1999) (SCALIA, J., dissenting) (The *Griffin* rule "runs exactly counter to normal evidentiary inferences: If I ask my son whether he saw a movie I had forbidden him to watch, and he remains silent, the import of his silence is clear."); *Lakeside* v. *Oregon*, 435 U. S. 333, 340 (1978) (It is "very doubtful" that jurors, left to their own devices, would not draw adverse inferences from a defendant's failure to testify.). It is precisely because the inference is often natural (but nonetheless prohibited) that the jury, if a defendant so

requests, is instructed not to draw it. · *Carter* v. *Kentucky*, 450 U. S. 288, 301–303 (1981) (An uninstructed jury is likely to draw adverse inferences from a defendant's failure to testify, so defendants are entitled to have trial courts instruct juries that no such inference may be drawn.).

The inference involved in *Griffin* is at least as "natural" or "irresistible" as the inference the prosecutor in Agard's case invited the jury to draw. There are, to be sure, reasons why an innocent defendant might not want to testify. Perhaps he fears that his convictions for prior crimes will generate prejudice against him if placed before the jury; perhaps he has an unappealing countenance that could produce the same effect; perhaps he worries that cross-examination will drag into public view prior conduct that, though not unlawful, is deeply embarrassing. For similar reasons, an innocent person might choose to remain silent after arrest. But in either the *Griffin* scenario of silence at trial or the *Doyle* scenario of silence after arrest, something beyond the simple innocence of the defendant must be hypothesized in order to explain the defendant's behavior.

Not so in the present case. If a defendant appears at trial and gives testimony that fits the rest of the evidence, sheer innocence could explain his behavior completely. The inference from silence to guilt in *Griffin* or from silence to untrustworthiness in *Doyle* is thus more direct than the inference from presence to tailoring.[6] Unless one·has prejudged

---

[6] The Court describes the inference now at issue as one not from presence to tailoring but merely from presence to *opportunity* to tailor. *Ante*, at 71, n. 2. The proposition that Agard simply had the opportunity to tailor, we note, is not what the prosecutor urged upon the jury. She encouraged the jury to draw, from the *fact* of Agard's opportunity, the *inference* that he had actually tailored his testimony. See App. 49 (Defendant was able "to sit here and listen to the testimony of all the other witnesses before he testifie[d]. . . . [He got] to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence? . . . He's a smart man. . . . He used everything to his advantage.")

the defendant as guilty, or unless there are specific reasons to believe that particular testimony has been altered, the possibility that the defendant is telling the truth is surely as good an explanation for the coherence of the defendant's testimony as any that involves wrongful tailoring. I therefore disagree with the Court's assertion, *ante*, at 68, that the Court of Appeals' decision in Agard's case differs from our decision in *Griffin* by "requir[ing] the jury to do what is practically impossible."[7] It makes little sense to maintain that juries able to avoid drawing adverse inferences from a defendant's silence would be unable to avoid thinking that only a defendant's opportunity to spin a web of lies could explain the seamlessness of his testimony.

The Court states in the alternative that if proscribing generic accusations of tailoring at summation does not require the jury to do the impossible, then it prohibits prosecutors from "inviting the jury to do what the jury is perfectly entitled to do." *Ante*, at 68. The Court offers no prior authority, however, for the proposition that a jury may constitutionally draw the inference now at issue. The Second Circuit thought the matter open, and understandably so in light of *Griffin* and *Carter*. But even if juries were permitted to draw the inference in question, it would not follow that prosecutors could urge juries to draw it. *Doyle* prohibits prosecutors from urging juries to draw adverse inferences from a defendant's choice to remain silent after re-

---

[7] In fact, the Court of Appeals' decision in Agard's case does not tell juries to do *anything*; it merely prevents prosecutors from inviting them to do something. I presume that the Court means to say that the Court of Appeals' decision prohibits prosecutors from inviting juries to do something jurors will inevitably do even without invitation. In either case, however, the Court's confidence that all juries will naturally regard the defendant's presence at trial as a reason to be suspicious of his testimony is perplexing in light of the Court's equal confidence that allowing comment on the same subject is "essential" to the truth-finding function of the trial. See *ante*, at 73. If all juries think this anyway, the pursuit of truth will not suffer if they are not told to think it.

ceiving *Miranda* warnings, but the Court today shows no readiness to say that juries may not draw that inference themselves. See *ante*, at 74–75. It therefore seems unproblematic to hold that a prosecutor's latitude for argument is narrower than a jury's latitude for assessment.

In its final endeavor to distinguish the two inferences, the Court maintains that the one in *Griffin* goes to a defendant's guilt but the one now at issue goes merely to a defendant's credibility as a witness. See *ante*, at 69. But it is dominantly in cases where the physical evidence is inconclusive that prosecutors will concentrate all available firepower on the credibility of a testifying defendant. Argument that goes to the defendant's credibility in such a case also goes to guilt. Indeed, the first sentence of the Court's account of the trial in this case acknowledges that the questions of guilt and credibility were coextensive. See *ante*, at 63 (Agard's trial "ultimately came down to a credibility determination.").

The Court emphasizes that a prosecutor may make an issue of a defendant's credibility, and it points for support to our decisions in *Jenkins* v. *Anderson,* 447 U. S. 231 (1980), and *Brooks* v. *Tennessee,* 406 U. S. 605 (1972). See *ante*, at 69–70. But again, the distinction between cross-examination and summation is critical. Cross-examination is the criminal trial's primary means of contesting the credibility of any witness, and a defendant who is also a witness may of course be cross-examined. *Jenkins* supports the proposition that cross-examination is of sufficient value as an aid to finding truth at trial that prosecutors may sometimes question defendants even about matters that may touch on their constitutional rights, and *Brooks* suggests that cross-examination can expose a defendant who tailors his testimony. See *Jenkins,* 447 U. S., at 233, 238; *Brooks,* 406 U. S., at 609–612. Thus the prosecutor's tactics in *Jenkins* and our own counsel in *Brooks* are entirely consistent with the moderate restriction on prosecutorial license that the Court today rejects.

\* \* \*

In the end, we are left with a prosecutorial practice that burdens the constitutional rights of defendants, that cannot be justified by reference to the trial's aim of sorting guilty defendants from innocent ones, and that is not supported by our case law. The restriction that the Court of Appeals placed on generic accusations of tailoring is both moderate and warranted. That court declared it permissible for the prosecutor to comment on "what the defendant testified to regarding pertinent events"—"the fit between the testimony of the defendant and other witnesses." 159 F. 3d, at 99. What is impermissible, the Second Circuit held, is simply and only a summation "bolstering . . . the prosecution witnesses' credibility vis-a-vis the defendant's based solely on the defendant's exercise of a constitutional right to be present during the trial." *Ibid.* I would affirm that sound judgment and therefore dissent from the Court's disposition.