**Dion HARDAWAY, Petitioner,**

v.

**Pamela WITHROW, Respondent.**

**No. 98–CV–75294–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 21, 2001.

Dion Hardaway, Ionia, MI, Pro se, Sanford Plotkin, Farmington Hills, MI, for Petitioner.

Carolyn M. Breen, Wayne County Prosecutor's Office, Detroit, MI, Janet Van Cleve, MI Dept. of Atty. Gen., Lansing, MI, for Respondent.

### OPINION AND ORDER GRANTING THE PETITION FOR WRIT OF HABEAS CORPUS

TARNOW, District Judge.

I. *BACKGROUND* ..................................................... 700

II. *STANDARD OF REVIEW* ........................................... 703

III. *DISCUSSION* ..................................................... 703

 Claim # I. Petitioner was denied a fair trial as guaranteed by the Sixth and Fourteenth Amendments by the prosecutor's improper cross-examination of the petitioner which infringed on petitioner's Sixth Amendment right to the effective assistance of counsel and the attorney-client privilege. ................ 703

 Claim # II. Petitioner's right to due process was violated by the trial court's failure to properly instruct the jury on the elements of second degree murder and by erroneously instructing the jury that it could not consider the lesser offense of manslaughter unless it found Mr. Hardaway not guilty of second degree murder. ....................................... 706

Claim # III. Petitioner was denied due process where the trial court erroneously gave an involuntary manslaughter instruction instead of the applicable voluntary manslaughter instruction when the jury asked for clarification on the law of manslaughter. ...........................................709

IV. *ORDER* ......................................................712

Dion Hardaway, ("petitioner"), presently confined at the Michigan Reformatory in Ionia, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed both *pro se* and through counsel Sanford Plotkin, petitioner challenges his conviction of one count of second degree murder, M.C.L.A. 750.317; M.S.A. 28.549, and one count of possession of a firearm in the commission of a felony. M.C.L.A. 750.227b; M.S.A. 28.424(2). Because the trial court gave an instruction that effectively denied petitioner of his defense, petitioner's application for writ of habeas corpus is conditionally **GRANTED**.

## I. *BACKGROUND*

Petitioner was charged with first-degree murder, assault with intent to commit murder, and possession of a firearm in the commission of a felony, arising from an incident that occurred in Detroit, Michigan on October 6, 1994. Following a jury trial in the Detroit Recorder's Court, petitioner was found guilty of the lesser offense of second degree murder, not guilty of assault with intent to commit murder, and guilty of the felony-firearm charge.

The prosecution's theory of the case was that petitioner intended to commit a robbery by killing Mario Lenzy, Deandre Berry, and Latoya Webb, persons whom petitioner had agreed to act for as a middleman to obtain marijuana. During the unsuccessful robbery attempt, Lenzy was shot and killed by petitioner.

Petitioner's defense at trial was that he shot Lenzy in self-defense after observing Lenzy make a sudden reaching movement in the direction of a firearm that had been in his possession.

Latoya Webb testified that she was Lenzy's girlfriend. She, Lenzy, Berry, and a man named Mike met with petitioner on the afternoon of October 6, 1994. Berry and Mike had a conversation with petitioner during this initial meeting. Later that day, Webb observed Lenzy and Berry counting four to five thousand dollars.

That evening, Lenzy, Webb, and Berry went to pick up petitioner at his grandmother's house. When they left to meet petitioner, Webb believed that they were going to buy a large amount of marijuana. Lenzy had a handgun in his possession when they left. Prior to arriving at petitioner's house, Lenzy stopped at a gas station and gave Webb his gun when he got out to pump gas. Webb placed the gun under her leg.

Webb and her two companions arrived at petitioner's house. Berry went to the door and had a conversation with petitioner. Berry returned to the car and told the others that they had to go somewhere else to purchase the marijuana. When petitioner arrived at the car, he asked Berry who Webb was. Berry informed petitioner that Webb was Lenzy's girlfriend. Petitioner told Berry that he had to go back to his house and call his friend to let him know how many people were in the car. While petitioner was inside of his house, Webb took the handgun and gave it back to Lenzy, because she became nervous and suspicious when petitioner went back into his house. Lenzy took the handgun and placed it under his leg. On cross-examina-

tion, Webb admitted that at the preliminary examination, she testified that when she gave the gun back to Lenzy, he placed it on his lap. She also admitted that she had previously testified at the preliminary examination that she was able to see the gun under Lenzy's leg, although she explained that she may not have understood the question.

When petitioner returned to the car, he told Lenzy to drive them to a house to purchase the marijuana. Petitioner directed Lenzy to a house on Pasadena Street in Detroit, Michigan. After passing the house twice, Lenzy parked the car in front of the house. Petitioner suggested that both he and Berry go to the house together. Berry, however, refused to go into the house with petitioner. Lenzy asked petitioner to go into the house and bring out a sample of the marijuana, so they could be sure that it was the same marijuana that they had seen their friend Mike purchase earlier in the day. Petitioner did not agree to get a sample of the marijuana. After Lenzy asked this question, there was a quick jerk and a gunshot went off from the side of the car where petitioner had been sitting. Prior to the gunshot, Lenzy handed his cellular phone to Webb. Webb testified that Lenzy had not said or done anything threatening. Although she was uncertain where Lenzy's hands were at the time of the shooting, Webb stated that they were not moving. After the shot was fired, Webb jumped from the car and ran to a church.

Deandre Berry's testimony was similar to Webb's testimony in many respects. Berry indicated that he was the link between Lenzy and petitioner. Prior to going to petitioner's house on the evening of October 6, 1994, Berry had been at Lenzy's house counting five thousand dollars. Berry testified that petitioner had promised to sell them ten pounds of marijuana

for three thousand dollars. Berry, Lenzy, and Webb drove to petitioner's house. On the way, they stopped at a gas station where Lenzy gave his gun to Webb. When they arrived at petitioner's house, petitioner came to the car. Berry testified that petitioner appeared shocked when he saw Webb in the car. He asked Berry who she was. When told that Webb was Lenzy's girlfriend, petitioner told Berry that he would have to go back into the house and inform the owner. While petitioner was inside, Berry told Lenzy that something didn't seem right and told him to get his gun back from Webb. Lenzy received the gun back from Webb and put it to his side. Berry couldn't see exactly where Lenzy placed the gun, because he was in the backseat.

When petitioner got back into the car, Lenzy drove the others to a house at Pasadena and Lodge in Detroit. According to Berry, petitioner appeared "jumpy" on the ride over to the house. He didn't take them directly to the house on Pasadena, but had them drive around the block before parking in front of the house. At the house, petitioner asked Berry if he had the money. Berry told petitioner to go wait on the porch of the house and that he would be with him in a moment. Petitioner refused to go to the porch, suggesting instead that both men should go together. Berry refused to go to the porch with petitioner and told petitioner to wait on the sidewalk. After petitioner refused, Lenzy asked petitioner if he could bring a quarter pound of marijuana from the house so they could make sure it was the same marijuana that they had purchased earlier. After asking petitioner to get the marijuana, Lenzy went to use his cellular phone and had flipped the phone down. Lenzy then made a gesture to go into his jacket pocket, but no words of hostility had been exchanged. At that point, Berry heard two gunshots. Berry saw Lenzy's

head leaning back. According to Berry, petitioner then pointed the gun at his head and he heard a click as petitioner unsuccessfully attempted to fire the gun. Webb, however, contradicted this part of Berry's testimony by indicating that she did not see petitioner point a gun at anyone's head. Berry then escaped from the car.

On cross-examination, Berry admitted that the marijuana transaction was supposed to be between him and petitioner, but that Lenzy and Webb were also present. Berry acknowledged that their presence may have made petitioner nervous. Berry also admitted that he did not see what Lenzy put in his hand as he reached for his jacket pocket.

Petitioner testified in his own defense. On October 6, 1994, Deandre Berry discussed purchasing ten pounds of marijuana from him for three thousand dollars. Later that night, petitioner paged Berry and asked him to come over to his house. When Berry came to the house, he was with two other people who petitioner did not know. When petitioner asked Berry who they were, he was informed that they were Berry's cousin and his girlfriend. Petitioner testified that he went back inside to tell the drug dealer how many people were coming to the house.

Petitioner came back and got into the rear driver's seat of the car. Before getting in the car, petitioner noticed something black sticking up from under Lenzy's leg. The object appeared to be a gun handle. Although it was dark outside, a light from the parking lot across the street enabled him to see the gun handle. When petitioner got into the car, he began giving Lenzy directions on how to get to the house.

Once at the house, petitioner asked Berry if he had the money. Berry did not say anything. Berry told petitioner to go to the house and that he would be there in a minute. Petitioner did not get out of the car, because he thought Lenzy might pass Berry his gun. Petitioner suggested that both he and Berry go up to the house. Berry again suggested that petitioner go to the house by himself. Lenzy then asked petitioner to bring them a sample of the marijuana. Petitioner refused, stating that this was not part of the plan. Lenzy became angry and told petitioner he was tired of f—ing around. After saying this, Lenzy began turning back towards petitioner and made a motion as though he was pulling the concealed weapon from under his leg. When petitioner saw Lenzy's arm raise and the handle of the gun, petitioner reached for his gun and shot Lenzy once. Petitioner denied trying to shoot Lenzy in a particular place. He also denied pointing the gun at Berry after firing the shot at Lenzy. After seeing blood in the car, petitioner exited the car and ran. Petitioner did not take any money from the car. Petitioner admitted that he went to California after the shooting, but claimed that he did so out of fear of retaliation from Lenzy's family.

Petitioner's conviction was affirmed on appeal. *People v. Hardway*, 187847 (Mich. Ct.App. August 26, 1997); *lv. den.* 458 Mich. 869, 586 N.W.2d 401 (1998). Justices Cavanaugh and Kelly would have granted review. *Id.* at 870, 586 N.W.2d 401. Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:

I. Petitioner was denied a fair trial as guaranteed by the Sixth and Fourteenth Amendments by the prosecutor's improper cross-examination of the petitioner which infringed on petitioner's Sixth Amendment right to the effective assistance of counsel and the attorney-client privilege.

II. Petitioner's right to due process was violated by the trial court's failure

to properly instruct the jury on the elements of second degree murder and by erroneously instructing the jury that it could not consider the lesser offense of manslaughter unless it found Mr. Hardaway not guilty of second degree murder.

III. Petitioner was denied due process where the trial court erroneously gave an involuntary manslaughter instruction instead of the applicable voluntary manslaughter instruction when the jury asked for clarification on the law of manslaughter.

## II. STANDARD OF REVIEW

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harpster v. State of Ohio, 128 F.3d 322, 326 (6th Cir.1997).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" oc-

curs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 1522.

## III. DISCUSSION

**Claim # I. Petitioner was denied a fair trial as guaranteed by the Sixth and Fourteenth Amendments by the prosecutor's improper cross-examination of the petitioner which infringed on petitioner's Sixth Amendment right to the effective assistance of counsel and the attorney-client privilege.**

██ Petitioner alleges that the prosecutor improperly questioned him about whether he had reviewed the police reports, evidence technician reports, and witness statements in this case prior to testifying. Petitioner claims that these questions infringed on his Sixth Amendment right to the assistance of counsel and the attorney-client privilege.

During the cross-examination of petitioner, the prosecutor asked him whether he had read the police reports, evidence technician reports, and statements made by Webb and Berry to the police after the shooting (Trial T. Vol. II, pp. 130–131). The prosecutor then asked petitioner why he reviewed these materials:

Q [by William A. Rollstin, assistant prosecutor]: Why did you read their statements before you testified?

A [by petitioner]: Why would I read them? Because to help my lawyer out in case he overlook (sic) something.

Q: You're going to help Mr. Chambers out in lawyering; is it that?

A: Well, basically to help him out in case he overlook something.

Q: So that's the reason that you read those statements?

A: Yes.

Q: Wouldn't it be more correct to say that you read those statements to see where the better defense was for your case?

MR. CHAMBERS [the defense attorney]: Objection. That's asked and answered. He said four times why he read the statements.

THE COURT: Yes. I will sustain the objection. Sustained.

Q [by Mr. Rollstin]: Wouldn't it be correct to say that you had no idea that Mario had a gun when you shot him?

A: No.

Q: Isn't it true that you only learned about that gun after you were extradited and after your lawyer gave you their statements?

A: No.

Q: Then why else would you read them?

MR. CHAMBERS: Objection. Asked and answered.

THE COURT: Well, I don't know if that particular question was asked, so I overrule the objection.

Q: Then why else would you read them?

A: To help my lawyer out in case he overlook something.

(*Id.* at pp. 132–133).

In rejecting this claim, the Michigan Court of Appeals held that petitioner's opportunity and motive to fabricate testimony were permissible areas of inquiry by the prosecutor, because of the inference that petitioner fabricated his testimony about shooting the victim in self-defense. *People v. Hardway*, Slip. Op. at * 2.[1]

 Once a defendant takes the stand, he or she is subject to cross-examination which impeaches his or her credibility just like any other witness. *Jenkins v. Anderson*, 447 U.S. 231, 235–236, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). When a defendant assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him or her as well. *Portuondo v. Agard*, 529 U.S. 61, 120 S.Ct. 1119, 1125, 146 L.Ed.2d 47 (2000)(quoting *Perry v. Leeke*, 488 U.S. 272, 282, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989)). The Supreme Court has recognized that unless prosecutors are allowed "wide leeway in the scope of impeachment cross-examination", some defendants would be "able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge". *Doyle v. Ohio*, 426 U.S. 610, 617, fn. 7, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

In *Portuondo*, the United States Supreme Court held that a prosecutor's comments during summation, which called attention to the fact that the petitioner had

---

1. The Michigan Court of Appeals also ruled that this claim had not been preserved for appellate review, on the ground that petitioner's attorney did not object to these questions on the basis that they violated petitioner's right to the effective assistance of counsel and the attorney-client privilege, but rather, on the ground that the questions had been asked and answered. However, because respondent failed to affirmatively assert a procedural default defense in her answer to this claim, the procedural default defense is waived. *Jamison v. Collins*, 100 F.Supp.2d 521, 597 (S.D.Ohio 1998).

an opportunity to hear other witnesses testify and to tailor his testimony, did not unlawfully burden his right to be present at trial, to be confronted with witnesses, or to testify in his own behalf, and thus, did not violate due process. In so ruling, the Supreme Court noted that the prosecutor's comments concerned the defendant's credibility as a witness, and were in accord with the Supreme Court's longstanding rule that when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness." *Id.* at 1125 (*quoting Brown v. United States,* 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958)).

In support of his claim that the prosecution's questions violated his right to the effective assistance of counsel, petitioner points to *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), in which the U.S. Supreme Court held that a trial court's order preventing a defendant from consulting with his counsel about anything during a 17–hour overnight recess in the trial between his direct and cross-examination deprived defendant of his right to the assistance of counsel guaranteed by the Sixth Amendment. However, in so ruling, the Supreme Court noted that there were other ways to deal with the problem of possible improper influence on the defendant's testimony or 'coaching' of the defendant by counsel short of putting a barrier between client and counsel for a period as long as 17 hours. *Id.* at 89, 96 S.Ct. 1330. The Supreme Court suggested that a prosecutor could, within appropriate limits, cross-examine a defendant as to the extent of any "coaching" by counsel during a recess, noting that "skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination." *Id.* at 89–90, 96 S.Ct. 1330. Thus, even the holding in *Geders* suggests that it is permissible to cross-examine a petitioner about whether his or her attorney improperly coached his or her testimony without violating either a defendant's right to the effective assistance of counsel or the attorney-client privilege.

In the present case, there is no allegation that petitioner was prevented from consulting with defense counsel in preparation of his defense. Moreover, there is no indication that petitioner revealed any confidential communications between himself and his attorney during the prosecution's questions. While the right of a defendant to a confidential relationship with his or her attorney appears to be guaranteed by the Sixth Amendment, the mere possibility of a violation of that right does not provide a basis for federal habeas corpus relief. *See Layer v. Lyles,* 598 F.Supp. 95, 104 (D.Md.1984). Because petitioner has not shown that any confidential communications between himself and his attorney were revealed as a result of the prosecutor's questions, he is not entitled to habeas relief on this part of the claim.

■ Petitioner also argues that if prosecutors were permitted to ask defendants about whether they had reviewed police reports or witness statements, it would require defendants to choose between communicating with defense counsel in order to prepare for trial or remaining silent and not engaging in the preparation of a defense out of fear that the prosecutor would attempt to question the defendant about his or her efforts to help his or her lawyer prepare for trial. The U.S. Constitution does not forbid "every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *Jenkins v. Anderson,* 447 U.S. 231, 236, 100 S.Ct.

2124, 65 L.Ed.2d 86 (1980)(*quoting Chaffin v. Stynchcombe*, 412 U.S. 17, 30, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973)). A defendant may decide not to take the witness stand because of the risk of cross-examination. But this is a choice of litigation tactics. *Jenkins*, 447 U.S. at 238, 100 S.Ct. 2124. Once a defendant decides to testify, the interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant. It prevails, for example, in the balance of considerations determining the scope and limits of the privilege against self-incrimination. *Jenkins*, 447 U.S. at 238, 100 S.Ct. 2124 (*quoting Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958)). Thus, the mere fact that this line of questioning by prosecutors might force a defendant to choose between risking cross-examination by assisting his or her attorney in the preparation of a defense or remaining silent to avoid such impeachment, would not violate the Constitution.

In the present case, the Michigan Court of Appeals determined that the prosecutor's line of questioning was a permissible method of determining whether petitioner had fabricated his testimony concerning his claim of self-defense. Petitioner has failed to show that the Michigan Court of Appeals' decision was contrary to, or an unreasonable application of, clearly established federal law. Petitioner's first claim does not entitle him to relief.

**Claim # II. Petitioner's right to due process was violated by the trial court's failure to properly instruct the jury on the elements of second degree murder and by erroneously instructing the jury that it could not consider the lesser offense of manslaughter unless it found Mr. Hardaway not guilty of second degree murder.**

In his second claim, petitioner alleges that his due process rights were violated when the trial court failed to properly instruct the jury on all of the elements of second degree murder, by omitting the instruction that one of the elements required for second degree murder was a finding that the killing was not justified or excused. Petitioner also contends that the trial court erred when it instructed the jury that it could not consider the lesser offense of voluntary manslaughter unless it found petitioner not guilty of second degree murder.

The trial court gave the following instruction to the jury regarding the elements of second degree murder:

> If you decide that the defendant, Mr. Hardaway, is not guilty of first-degree murder, then you may consider the lesser offense of second-degree murder. And to prove this charge the prosecutor must prove three things—excuse me— two things beyond a reasonable doubt. Again, first, that the defendant, Mr. Hardaway, caused the death of Mr. Lenzy. That is, that Mr. Lenzy died as a result of the shooting. Secondly, that the defendant had one of these three states of mind at the time of the killing. That is, that Mr. Hardaway either intended to kill Mr. Lenzy, or that he intended to do great bodily harm to Mr. Lenzy, or that he knowingly created a very high risk of death or bodily harm knowing that death or bodily harm would be the result of those actions. All right. Those are the two elements of second-degree murder.

(Trial T. Vol. III, p. 68).

The trial court subsequently instructed the jury on the lesser offense of voluntary manslaughter, but prefaced his instruction on the elements of voluntary manslaughter with the following remarks:

Now, if you decide that Mr. Hardaway is not guilty of first-degree murder and second-degree murder, then you may consider the lesser offense of voluntary manslaughter. (*Id.* at p. 69).

When the jury later requested reinstruction on the elements of second degree murder, the trial court essentially gave the jury the same instruction that it had earlier given them. (*Id.* at p. 79).

In rejecting petitioner's claim regarding the failure to instruct the jury on the element of justification, The Michigan Court of Appeals rejected petitioner's claim because of his attorney's failure to object to the instructions. The Michigan Court of Appeals further found that the jury instructions as a whole were adequate because the trial court instructed the jury on the defense of self-defense. *People v. Hardway,* Slip. Op. at * 2. The Michigan Court of Appeals did find that the trial court erred in its instruction regarding the order of deliberations, but refused to reverse because of petitioner's failure to object to the instruction at trial. *Id.*

With respect to petitioner's second claim, the State of Michigan appears to hold that the claim is procedurally defaulted. While not using that term specifically, respondent notes in her answer that petitioner failed to object to the instructions at trial and that as a result, review of petitioner's claim is barred. It is unnecessary to determine whether petitioner's claim is procedurally defaulted, because assuming that it were not, petitioner is still not entitled to habeas relief on this claim.

■ The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack upon the constitutional validity of a state court conviction is even greater than the showing required in a direct appeal. The question in such a collateral proceeding is whether the ailing instruction so infected

the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even "universally condemned," and an omission or incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbe,* 431 U.S. 145, 154–155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Williams v. Abshire,* 544 F.Supp. 315, 319 (E.D.Mich.1982)(Joiner, J.). The challenged instruction must not be judged in isolation but must be considered in the context of the entire jury charge. *Jones v. United States,* 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). To warrant habeas relief, the jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Scott v. Mitchell,* 209 F.3d 854, 882 (6th Cir.2000). Allegations of trial error raised in challenges to jury instructions are reviewed for harmless error by determining whether they had a substantial and injurious effect or influence on the verdict. *Id.* A habeas petitioner's burden of showing prejudice is especially heavy when a petitioner claims that a jury instruction was incomplete, because an omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. *Fama v. Commissioner of Correctional Services,* 69 F.Supp.2d 388, 397 (E.D.N.Y. 1999); *aff'd* 235 F.3d 804 (2nd Cir.2000).

■ Petitioner initially claims that the trial court erred in failing to instruct the jury on one of the elements of second degree murder, namely, a finding by the jury that the killing was not justified or excused. It is necessary to read the court's instructions as a whole to determine whether the jury has been adequately advised of the essential elements of the

offense charged. *Miles v. Nix,* 911 F.2d 146, 148 (8th Cir.1990).

The offense of second degree murder consists of the following elements:

1. a death;
2. caused by an act of the defendant;
3. with malice, and
4. without justification or excuse.

*People v. Goecke,* 457 Mich. 442, 463–464, 579 N.W.2d 868 (1998).

A review of the trial court's instructions shows that the trial court failed to instruct the jury that one of the elements required for second degree murder was that the killing was without justification or excuse. However, the trial court did instruct the jury on petitioner's defense of self-defense:

> Now the defendant claims that he acted in lawful self-defense. A person has the right to use force or even take a life to defend himself under certain circumstances. If a person acted in lawful self-defense, his actions are excused and he is not guilty of any crime.

The trial court proceeded to instruct the jury on what rules it should consider to determine whether petitioner acted in lawful self-defense. The trial court concluded by instructing the jury that petitioner did not have to prove that he acted in self-defense, but that the prosecutor had to prove beyond a reasonable doubt that petitioner did not act in self-defense.

This Court concludes that the trial court's instructions as a whole adequately explained to the jury that the prosecution had to prove that the killing was not justified or excused in order to find petitioner guilty of second degree murder. The jury was informed of the defense of self-defense and the prosecutor's burden of proving that petitioner did not act in self-defense. Therefore, the jury was informed that they would have to find that the killing was not justified or excused in order to find peti-

tioner guilty of second degree murder. Petitioner is not entitled to habeas relief on this part of his claim.

■ Petitioner also contends that the trial court erroneously instructed the jury that it could not consider the lesser offense of voluntary manslaughter unless it first found petitioner not guilty of second degree murder. Under Michigan law, the trial court should not have instructed the jury that it could consider second degree murder if it were unable to agree whether to convict or acquit petitioner of the first degree murder charge, and then could consider voluntary manslaughter, if they were unable to agree whether to convict or acquit of the second degree murder charge. *See People v. Handley,* 415 Mich. 356, 361, 329 N.W.2d 710 (1982). However, jury instructions that contain errors of state law may not form the basis for federal habeas relief. *Gilmore v. Taylor,* 508 U.S. 333, 342–344, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); *Scott v. Mitchell,* 209 F.3d at 875.

Several federal habeas courts have rejected similar claims as the one brought by petitioner involving the order of deliberations. In *Roberts v. Bowersox,* 61 F.Supp.2d 896, 928–929 (E.D.Mo.1999), the federal district court held that a state trial court's alleged error in instructing a jury that it had to first acquit petitioner of the charged offense of first-degree murder in order to consider convicting him of any lesser included offense, did not result in a fundamental defect or manifest injustice so as to deprive petitioner of a fair trial and thus, did not warrant habeas relief. Similarly, in *Jamison v. Collins,* 100 F.Supp.2d 647, 719 (S.D.Ohio 2000), the federal district court held that an instruction that the jury was to proceed to consider the lesser included offense of involuntary manslaughter if it found that the

prosecutor failed to prove any element of the aggravated murder charge, did not deny petitioner a fundamentally fair trial so as to warrant federal habeas relief, even though the preferred instruction was that the jury should consider the lesser-included offense if they were unable to agree unanimously on the charged offense, without requiring acquittal on that offense.

■ This Court concludes that while the preferred instruction to the jury would be for them to consider the lesser offense of voluntary manslaughter, if they were unable to reach a verdict on the second degree murder charge, the trial court's instruction to the jury that they could consider the offense of voluntary manslaughter if they decided that petitioner was not guilty of first or second degree murder was only a violation of state law and did not deprive petitioner of a fundamentally fair trial so as to afford him habeas relief.

**Claim # III. Petitioner was denied due process where the trial court erroneously gave an involuntary manslaughter instruction instead of the applicable voluntary manslaughter instruction when the jury asked for clarification on the law of manslaughter.**

■ In his third claim, petitioner claims that the trial court erroneously gave an involuntary manslaughter instruction instead of the applicable voluntary manslaughter instruction when the jury asked for clarification on the law of manslaughter. When the jury requested reinstruction on the elements of second degree murder, the trial court declined at that time to give a supplemental instruction on the elements of voluntary manslaughter, even though both the prosecutor and defense counsel noted that a juror had requested it. (Trial T., Vol. III, pp. 79–81).

However, prior to the verdict coming in, the trial court made the following remarks to counsel:

All right. Let me just say, gentlemen, that I did get a note wherein the jury asked for a xerox copy of 2nd Degree involuntary manslaughter and I sent those in to them and we just a couple of minutes ago got a note from them indicating that they have a verdict, so let's bring the jurors in (Verdict T., p. 2).

With respect to petitioner's third claim, the Michigan Court of Appeals reviewed the record and concluded that the trial court either misspoke or the trial court's statement was mistranscribed, noting that there was no evidence that the jury was ever given an instruction on involuntary manslaughter. *People v. Hardway*, Slip. Op. *Id.* at * 2–3. Respondent answers that there is no offense of second degree involuntary manslaughter.

The Court cannot accept the finding by the Michigan Court of Appeals or the argument by respondent that the trial court's comments about sending a copy of an involuntary manslaughter instruction into the jury room was either a mistranscription or a misstatement on the part of the trial court. A court reporter's transcript is presumed to be accurate or correct. *Abatino v. United States,* 750 F.2d 1442, 1445 (9th Cir.1985); *United States v. Hoffman,* 607 F.2d 280, 286 (9th Cir.1979). Respondent has not offered any proof to rebut this presumption, either in the state courts or with this Court. Besides her own speculations, respondent does not present any reason why this Court should suspect the transcript to be inaccurate. *Norris v. Schotten,* 146 F.3d 314, 333 (6th Cir.1998). This Court must therefore presume that the trial court's comment about sending a copy of an involuntary manslaughter instruction into the jury room was accurately transcribed for purposes of

habeas review. To do otherwise would be to negate the integrity of the appellate system. The transcript's presumed accuracy is crucial.

In the present case, the jury was instructed on the original charge of first degree murder, second degree murder, and voluntary manslaughter. When the jury requested reinstruction on the lesser offense of second degree murder, the trial court declined to give a supplemental instruction on the lesser offense of voluntary manslaughter, even though a juror had requested it. Instead, the trial court erroneously sent an instruction on the offense of involuntary manslaughter into the jury room.

In order for petitioner to obtain habeas relief for this claim, petitioner must demonstrate that the trial court's decision to send an involuntary manslaughter instruction into the jury room, instead of the correct voluntary manslaughter instruction, had a substantial or injurious effect or influence in determining the jury's verdict and resulted in actual prejudice to petitioner. *Barker v. Yukins,* 199 F.3d 867, 872–873 (6th Cir.1999); *cert. den. sub. nom. Yukins v. Barker,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000).

 In the present case, at least one of the jurors requested clarification on the law of voluntary manslaughter. Where a jury, desiring additional instructions, makes explicit its difficulties, a trial judge should clear them away with concrete accuracy. *Bollenbach v. United States,* 326 U.S. 607, 612–613, 66 S.Ct. 402, 90 L.Ed. 350 (1946). If the judge's last minute instruction is a special ruling on a vital issue and is misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge. *Id.* at 612, 66 S.Ct. 402. It is fundamental error to give instructions which are hopelessly confusing and which fail to provide even the barest legal guideposts to aid the jury in rationally reaching a decision. *Reynolds v. Green,* 184 F.3d 589, 594 (6th Cir.1999) (citations omitted). A general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground. *Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). When two theories of culpability are submitted to the jury, one correct, and the other incorrect, it is impossible to tell which theory of culpability the jury followed in reaching a general verdict. *Suniga v. Bunnell,* 998 F.2d 664, 670 (9th Cir.1993)(quoting *Sheppard v. Rees,* 909 F.2d 1234, 1237–1238 (9th Cir.1989)). A jury cannot be presumed to have chosen the correct instruction when the trial court has given contradictory instructions. *Standen v. Whitley,* 994 F.2d 1417, 1422 (9th Cir.1993).

In the present case, the jury was instructed on the lesser offense of voluntary manslaughter. However, when the jurors requested clarification on this offense, the trial court instead sent a copy of an instruction on involuntary manslaughter into the jury room. The two offenses are separate and distinct from one another. Voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation and before a reasonable time has passed for the blood to cool. *People v. Fortson,* 202 Mich.App. 13, 19, 507 N.W.2d 763 (1993).

Involuntary manslaughter is the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to per-

form a legal duty. *People v. Clark*, 453 Mich. 572, 578, 556 N.W.2d 820 (1996). Involuntary manslaughter is established if the defendant acts in a grossly negligent, wanton, or reckless manner, causing the death of another. *People v. Moseler*, 202 Mich.App. 296, 298, 508 N.W.2d 192 (1993). Clearly, voluntary manslaughter is an intentional killing (mitigated by the heat of passion), whereas involuntary manslaughter is an unintentional killing. *See People v. Booker*, 208 Mich.App. 163, 171, 527 N.W.2d 42 (1994). The two offenses involve distinct theories of culpability. The trial court's submission of the incorrect involuntary manslaughter instruction to the jury, after being requested to clarify the law on the offense of voluntary manslaughter, was erroneous.

The question becomes whether this error was harmless. In *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the U.S. Supreme Court held that when a federal court judge in a habeas proceeding is in grave doubt about whether a trial error of federal constitutional law had a substantial and injurious effect or influence in determining the jury's verdict, the error is not harmless. The focus in such a situation is not merely whether there is enough evidence to support the result, apart from the phase affected by the error. It is, rather, even so, whether the error itself has substantial influence. If so, or a judge is left in grave doubt, the conviction cannot stand. *O'Neal*, 513 U.S. at 438, 115 S.Ct. 992. Only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment, should the judgment stand. *Barker v. Yukins*, 199 F.3d at 874.

This Court cannot state with certainty that submission of an erroneous involuntary manslaughter instruction to the jury, where the jury had already indicated they did not understand the initial instruction on voluntary manslaughter, had little or no impact on the verdict. In the present case, it is apparent from the jury's questions that they were focused on choosing between finding petitioner guilty of second degree murder or voluntary manslaughter. It is also clear that they were struggling with the verdict. *Reynolds v. Green*, 184 F.3d at 595. The offense of involuntary manslaughter involves an unintentional killing. By sending an instruction on this offense into the jury room, the trial court could have unduly confused the jury, because they may have concluded that if they found that petitioner intentionally shot the victim, their only options were to find him guilty of first or second degree murder, as opposed to voluntary manslaughter. Even though the jury had earlier been instructed on the elements of voluntary manslaughter, the Court cannot presume that the jury chose the correct instruction when the trial court later gave them the contradictory instruction of involuntary manslaughter. *Standen*, 994 F.2d at 1422.

This Court concludes that the submission of the erroneous involuntary manslaughter instruction to the jurors was not harmless error. There was evidence that petitioner believed he was acting in self-defense. This evidence indicates that with the proper instructions on voluntary manslaughter, the jury might not have convicted him of second degree murder. *See Rose v. Lane*, 910 F.2d 400, 403 (7th Cir. 1990). This Court concludes that the trial court's submission of the erroneous involuntary manslaughter instruction to the jury had a substantial and injurious effect or influence on petitioner's case and deprived petitioner of his right to due process and a fair trial. The trial court's decision to send an erroneous involuntary manslaughter instruction into the jury room "caused the jury to deliberate under the wrong legal standard and probably

affected the outcome of the trial." *Reynolds,* 184 F.3d at 595–596.

Petitioner is therefore entitled to habeas relief. The appropriate relief in this case is an order granting the respondent the option of retrying petitioner on the offense of second degree murder, or in the alternative, to vacate the second degree murder conviction, enter a judgment against petitioner on the lesser included offense of voluntary manslaughter and sentencing him accordingly. *See e.g. Steinkuehler v. Meschner,* 176 F.3d 441, 447 (8th Cir.1999).

### IV. ORDER

IT IS HEREBY ORDERED THAT PETITIONER'S APPLICATION FOR WRIT OF HABEAS CORPUS IS CONDITIONALLY GRANTED. UNLESS THE STATE TAKES ACTION TO AFFORD PETITIONER A NEW TRIAL ON THE OFFENSE OF SECOND DEGREE MURDER, OR IN THE ALTERNATIVE, TO VACATE THAT JUDGMENT AND ENTER A JUDGMENT AGAINST PETITIONER ON THE OFFENSE OF VOLUNTARY MANSLAUGHTER, WITHIN NINETY (90) DAYS OF THE DATE OF THIS OPINION, HE MAY APPLY FOR A WRIT ORDERING RESPONDENT TO RELEASE HIM FROM CUSTODY FORTHWITH.