# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37940

STATE OF IDAHO,

    Plaintiff-Respondent,

v.

DARIN WILLIAM PARTON,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

Boise, December 2012 Term

2013 Opinion No. 17

Filed: February 1, 2013

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Darla S. Williamson, District Judge.

The judgment of the district court is affirmed.

Spencer J. Hahn, Deputy State Appellate Public Defender, Boise, argued for appellant.

Jessica M. Lorello, Deputy Attorney General, Boise, argued for respondent.

---

EISMANN, Justice.

This is an appeal out of Ada County from a judgment of conviction for the felonies of domestic violence and attempted strangulation. The defendant challenges the trial court's decision to admit expert testimony regarding domestic violence and testimony of an excited utterance; the deputy prosecutor's actions in soliciting testimony of the defendant's post-custody silence when accused of the crimes; and the verdict finding defendant was a persistent violator. We affirm the judgment of the district court.

## I.

## Factual Background.

On a cold October night at about 3:00 a.m., two patrol officers working the night shift were taking a short break at a police substation. They had parked their patrol car near the back door and left it running to keep the interior warm and to prevent the computer mounted inside from shutting down. While inside the substation, one of the officers heard a knocking sound, which he at first thought was being made by the ventilation system. When he heard the knocking

again, he and the other officer investigated its source, which was the back door. Upon opening the door, they saw a 40-year-old woman curled up in a fetal position on the ground. She was dressed only in a tee-shirt and jeans and was not wearing shoes. She was very upset and crying and appeared to be injured and in pain. They asked, "Are you okay?," and she responded: "I need help. My boyfriend beat me up." The officers helped her into their patrol car where it was warm and called for paramedics.

While awaiting the paramedics, one of the officers questioned the woman about what had happened. She was still crying and upset. She said that her boyfriend had punched, kicked, and choked her; that his name was Darin Parton (Defendant); and that he was in a single-wide trailer across the street. Once the woman was placed in an ambulance to be transported to the hospital, the officers walked across the street to locate the trailer she had described. After doing so, they went to the hospital to gather more information from the woman.

At the hospital, they asked the woman in greater detail what had happened, and then they returned to the trailer with two other officers. After trying unsuccessfully to make contact with someone inside, they entered the trailer and located Defendant asleep in the back bedroom. They called to him to stand up and show his hands, but he did not respond. They then entered the bedroom and "placed him in custody," handcuffing him. Ultimately, they arrested him for domestic battery and attempted strangulation, both felonies.

At the preliminary hearing in magistrate court, the woman denied that Defendant had harmed her in any way. She testified that she had fallen asleep on the couch while watching television and was awakened when she felt something fall on her. When that occurred, she was scared and began screaming because she suffers from a panic disorder. She said that her two dogs (dachshunds) were then "all over me, and I fell off the couch and hit my head [on the coffee table]." According to her, Defendant had fallen on her, and when she was on the floor her two dogs were jumping and biting both she and Defendant. She said the dogs were all over her face and she was confused "because it was so chaotic." She then left the trailer because she was confused, hurt, and scared, and went to the police substation. She explained that she lied to the police about what had happened "[b]ecause I didn't want them to think I was crazy, and I didn't want to go to a place like Intermountain [Hospital] or a psychiatric unit to tell them that I was just freaked out." Based upon evidence other than the woman's testimony, Defendant was bound over to answer in the district court.

2

The State filed an information in the district court charging Defendant with the felonies of attempted strangulation and domestic violence. The State also filed a part two to the information alleging that he had previously been convicted of two felonies and that he should be considered a persistent violator if he were convicted of a felony in this case. Defendant entered a plea of not guilty in the district court, and the case was tried to a jury on May 3 and 4, 2010. The jury returned a verdict finding him guilty of both felonies. After receiving evidence of the two alleged prior felonies, it also returned a verdict finding that he was a persistent violator.

On the charge of attempted strangulation, the district court sentenced him to twenty-five years in the custody of the Idaho Board of Correction, with five years fixed and the remainder indeterminate. On the charge of domestic violence, the court sentenced him to ten years with five years fixed, with that sentence to run concurrently with the other sentence. Defendant then timely appealed.

## II.

### Did the District Court Abuse Its Discretion by Allowing Expert Testimony Regarding Defendant's Recorded Statements During Telephone Calls to the Woman?

The State called the woman as a witness during the trial. She stated that after Defendant came home from work, they had a few beers and then went to a local bar where they had additional drinks. After a while, Defendant became loud and obnoxious, and so she left and walked back to the trailer. Her son and his girlfriend later came to the trailer, and while they were still there, Defendant came in. According to the woman, he was obviously drunk because he was stumbling and his speech was slurred, and he stayed about five minutes and left. Her son and his girlfriend left about 11:00 p.m., and she then fell asleep on the couch while watching television. She was awakened at about 2:20 a.m. to the sound of Defendant coming into the trailer. Upon entering, he tried to hug her, but she pushed him away, telling him to go to bed. He then became aggressive. She testified in detail to Defendant pushing her down and then grabbing her hair with his left hand and using his right hand to punch her repeatedly in the face with a closed fist. As she was struggling to escape, he pulled her upright by her hair; grabbed her around the throat and lifted her so that her feet were off the floor; and then slammed her to the floor. She landed on her back, and he straddled her, sitting on her stomach. He then began

choking her to the point that she could not breathe. Fearing that he would kill her, she went limp pretending to be dead. When he let go and got off of her, she rolled over and tried to catch her breath. He then began kicking her and stomping on her and then got on top of her, grabbed her hair with both hands, and began pounding her head on the floor. At that point, she lost consciousness. She awoke with him pulling her head up between his knees by her hair and then dropping his weight in her face so her head hit the floor. She testified she could not remember much of what else happened, but she eventually escaped and ran to the police station.

The emergency room physician testified that when he saw the woman at the hospital, she was very upset and disoriented. He testified that she had been through "quite a bit of trauma," that she had "extensive bruising," and that she had probably lost consciousness. He stated that the triage nurse wrote in the medical records that the woman had been "kicked, hit, and choked by her boyfriend" and that she was "[c]omplaining of neck pain, head pain, headache and left wrist pain." The physician said she had "bruises about her entire face" and that they "were too many to describe." She also had red marks on her neck, bruises on her arm, and a small laceration on her head that was bleeding. After completing his examination, he diagnosed her with "[c]losed head injury; contusion, multiple sites; abrasions, multiple; and sprain, cervical."

Because the woman had testified at the preliminary hearing that Defendant had not harmed her, the State called two experts regarding domestic violence. The second expert was a detective who had listened to recordings of three telephone conversations between the woman and Defendant while he was in jail. The telephone calls were made on the day of Defendant's arrest. After the detective testified to his extensive training and experience regarding domestic violence, the recordings were admitted into evidence and played for the jury.

The deputy prosecutor then asked the detective what evidentiary value, if any, they had, based upon his training and experience as a domestic violence detective. The detective answered:

> Actually, I found it to have significant evidentiary value. To begin with, he makes obvious attempts to influence her in how she's going to proceed and how she's going to speak with people who conduct follow-up investigations in the prosecutor's office.
> In addition, he expresses his disappointment that she did not make up a story about getting in a fight with a chick in the bar.
> In addition, he never denies that he did this. I think that's strong, compelling evidence in a case like this.

4

And then beyond that, as she goes down the list of the things that he did to her, he acknowledges all those things. He says, "I know, I know, I know."

Defense counsel then objected on the ground that he did not recall Defendant saying "I know" in the recordings. The district court responded that the jury heard the audio and could decide what was said. The deputy prosecutor asked the detective to continue, and he stated: "Well, as he responds to her saying what he had done to her, you know, there's no denials."

Defense counsel again objected, stating that the jury did not need the detective to tell them what the calls said. During the ensuing colloquy among court and counsel, defense counsel stated that "the jury is entirely capable of drawing their conclusions from having listened to them," apparently objecting on the ground that the detective's specialized knowledge would not assist the jury to understand the evidence or to determine a fact at issue. The court asked if the deputy prosecutor was offering the testimony as an expert opinion, and the deputy prosecutor responded that while the detective had expertise in the area of domestic violence, the deputy prosecutor was limiting the testimony to what evidentiary value the calls have to a detective. The court then asked if it was "as a detective with the Boise City Police Department, having experience and expertise in the area of domestic violence," and the deputy prosecutor answered, "Yes." Defense counsel again objected on the ground that expert testimony was not necessary. The deputy prosecutor then stated that she was not offering the detective as an expert witness but as a fact witness. She stated:

> And I'm not offering him right now as an expert under [Idaho Rule of Evidence] 702. He is a fact witness with regard to these calls because he heard them with his own ears. He wrote a police report about them that's been provided to defense counsel. So it's not an expert in terms of 702, but he does have some additional expertise in the area that would ultimately—

The court then asked whether the detective would be offering conclusions as to whether someone should be prosecuted based upon what was stated during the telephone calls, and the deputy prosecutor answered, "Just what, if any, evidentiary value they had." Finally, the court stated: "I'm not sure this is much different than a DUI evaluation. It seems to be in the realm of an investigative officer's duty as to what evidence that they would look at in putting together a case." The court then allowed the detective to testify. He recounted several statements by Defendant during the telephone calls that the detective characterized as "manipulative efforts"

5

and stated they were "something that, as a domestic violence detective I'm always looking for, because that is ingrained in this type of crime."

On appeal, Defendant contends that the detective's testimony was not relevant. In order to preserve the issue for appeal, "[a]n objection to the admission of evidence must state the specific ground for the objection, if it is not apparent from the context." *State v. Cannady*, 137 Idaho 67, 72, 44 P.3d 1122, 1127 (2002). The only objection made by defense counsel was that the detective's testimony would not assist the jury to understand the evidence or to determine a fact in issue.

Rule 702 of the Idaho Rules of Evidence states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Expert testimony is only admissible when the expert's specialized knowledge will assist the trier of fact to understand the evidence and determine a fact in issue." *State v. Walters*, 120 Idaho 46, 55, 813 P.3d 857, 866 (1990). "The determination of whether expert testimony will assist the trier of fact 'lies within the broad discretion of the trial court.' " *Kuhn v. Coldwell Banker Landmark, Inc.*, 150 Idaho 240, 252, 245 P.3d 992, 1004 (2010).

Defendant does not argue that the district court abused its discretion in permitting the detective to testify. He argues that it was error to permit the detective to testify because the deputy prosecutor expressly stated that she was not offering the detective as an expert. It is apparent from the deputy prosecutor's statements that she did not understand the difference between an expert witness and a fact witness. The detective had no direct knowledge of any facts in this case. The deputy prosecutor apparently believed that a witness who utilizes his or her expertise to draw conclusions from facts somehow then becomes simply a fact witness. As Defendant states in his opening brief on appeal, "[A]lthough the State claimed that it was not offering [the detective] as an expert, it is clear from the State's argument and the presentation of [the detective's] background that the State was relying on his specialized knowledge of domestic violence." (Footnote omitted.)

The issue is not whether the deputy prosecutor understood the rules of evidence. It is whether the district court abused its discretion in permitting the detective to testify as an expert. The district court seemed to understand that the detective was being offered as an expert, based

upon the court's statement, "I'm not sure this is much different than a DUI evaluation." The deputy prosecutor's lack of knowledge does not show that the district court abused its discretion.

Defendant also argues that the inflammatory nature of the detective's ultimate testimony shows that it was error to admit it. As stated above, the only objection was whether the detective could offer expert testimony—whether it would assist the trier of fact. There were no objections to the opinions he ultimately gave. That he ultimately gave some testimony that would be objectionable does not establish that the district court abused its discretion in permitting him to testify in the first place.

Defendant has not shown that the district court abused its discretion in permitting the detective to testify as an expert on domestic violence.


## III.

### Did the District Court Abuse Its Discretion by Allowing Testimony of the Woman's Out-Of-Court Statements Under the Excited Utterance Exception?

Prior to trial, Defendant moved to prevent the police officers from testifying to the woman's statement that her boyfriend beat her up. There was an evidentiary hearing at which both the woman and one of the officers testified. At the conclusion of the hearing, the district court ruled that the statement was admissible as an excited utterance under Rule 803(2) of the Idaho Rules of Evidence. This exception to the hearsay rule has two requirements: "(a) There must be an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of an observer; and (b) the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought." *State v. Poe*, 139 Idaho 885, 904, 88 P.3d 704, 723 (2004). When deciding whether an out-of-court statement falls within this exception to the hearsay rule, the trial court may consider factors which include the lapse of time between the startling occurrence or event and the statement, the nature of the occurrence or event, the condition of the declarant, the presence or absence of self-interest when the statement was made, and whether the statement was volunteered or made in response to a question. *Id.* "[A]dmission of excited utterances as an exception to the hearsay rule is left to the sound discretion of the trial court." *State v. Bingham*, 116 Idaho 415, 421, 776 P.2d 424, 430 (1989).

The woman testified that she ran to the police substation because she was afraid for her life. When she got there, she knocked on the front door, but nobody answered. She then went around to the back, where she saw a police car running. She walked up to the car and looked inside to see if anyone was there, and then saw the back door of the building. She pounded on it, but nobody answered. She then walked to the front door of the building to see if anyone was there, and then walked back to the back door. When asked how much time passed, she answered: "I don't know. I just remember I just put my head down, thinking, they'll find me. They'll find me. And I don't know if I fell asleep or what because I just hurt." When asked if she hurt her head, she responded: "I was hurting, hurting. My head was hurting. I was scared. I was trying to get away, just wanted to be safe." On cross examination, she was asked if she could have spent ten to fifteen minutes going back and forth between the front and back door, and she answered, "About, I think." She was then asked if she may have fallen asleep, and she responded: "Yeah, because, like I said, everything's a blur. I mean, when it comes to that because it just barely happened."

The officer testified that they discovered the woman no more than thirty minutes after they had arrived at the substation and that it was probably fifteen to twenty minutes after they had arrived when they heard the knocking. He said that he first thought it was sounds from the ventilation system, but when it continued they investigated the source of the sound and discovered the woman at the back door.

The district court considered the following factors. About twenty minutes elapsed between the startling event (her boyfriend battering her to the point that she was afraid he would kill her) to her making the statement to the police. When the officers found her, she was on the ground in a fetal position crying. She did not take time to put on her shoes when she fled, indicating how afraid she was. When the officers found her, they did not ask, "What happened." They asked, "Are you okay?" The woman's statement that her boyfriend beat her up was not made in response to a question designed to incriminate anyone by her response. The court realized that it had discretion to decide whether the statement qualified as an excited utterance, and it determined that it did.

On appeal, Defendant argues that as a matter of law the statement could not be an excited utterance because "a statement made by an adult victim of domestic violence, who fell asleep between the startling event and the making of the statement, cannot be an excited utterance."

8

(Footnote omitted.) The woman did not state that she fell asleep. She stated that she may have because everything was a blur. She was not asleep when the officers found her, and the officer testified that upon hearing the knocking sound again they investigated the source of the sound and discovered her when they opened the back door. From his testimony, it would appear that they discovered her shortly after the last knocking sound. Under the facts found by the district court, the statement was not inadmissible as a matter of law.

Defendant also states, "Additionally, the fact that the statement was made in response to a question is a circumstance that cuts against classifying the statement as an excited utterance." That was certainly a factor to argue to the district court, but on appeal we do not reweigh the facts to determine whether the statement fits within the classification of an excited utterance. The issue on appeal is whether the district court abused its discretion. The district court took this fact into consideration and noted that the officer asked the woman if she was okay, not what happened. Defendant has not shown that the district court abused its discretion in admitting the evidence.

## IV.

### Did the State's Conduct in Eliciting Testimony of and Commenting on Defendant's Silence Constitute Fundamental Error Requiring a New Trial?

Defendant contends that the deputy prosecutor committed fundamental error when she elicited testimony of his pre-arrest silence and his post-*Miranda* warnings refusal to answer a question about the crime, and when she commented during her closing argument about his pre-arrest silence. Defendant did not testify during the trial, and so there is no issue regarding impeaching his testimony. Also, none of these alleged errors were objected to at trial. Therefore, to show fundamental error:

> (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010) (footnote omitted).

9

**(1) Whether one or more of the defendant's unwaived constitutional rights were violated.** The first prong of the *Perry* analysis is that "the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated." *Id*. "The Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution for commenting on the silence of a defendant who asserts the right." *Jenkins v. Anderson*, 447 U.S. 231, 235 (1980).

The deputy prosecutor questioned the first officer to testify about Defendant's failure to make any statements after he had been handcuffed in his bedroom and was, according to the officer, placed in custody, but before he was either arrested or read his *Miranda* rights. Defendant contends that this violated his Fifth Amendment rights. The questions and answers were as follows:

> Q. After, did he acknowledge that that was, in fact, his driver's license?
> A. He was very uncooperative with us. I don't think he even ever acknowledged that was him and that was his driver's license. Just very uncooperative with us.
> . . . .
> Q. And did he make any statements regarding why you were there or the events of the evening?
> A. As I recall, the only statement that I recall him making is that he didn't know what was going on.
> Q. And at some point was he under arrest?
> A. Yes.
> Q. And for what was he under arrest?
> A. For domestic battery and attempted strangulation.
> Q. Why was he under arrest at that time?
> A. Just based on [the woman's] statements, her injuries and his lack of statements to us, telling us exactly what happened.
> Q. Now Mr. Parton, in fact, had some injuries, too, didn't he?
> A. Yes, he did.
> Q. And why didn't you go arrest [the woman] or investigate her for the crime of domestic battery?
> A. [The woman] is the one who actually called us for help. We figured if he would have been injured and needing help, he would have been the one that called us.

The United States Supreme Court has never held that the Fifth Amendment protects against the use of prearrest, pre-*Miranda* silence. In *Jenkins*, the defendant contended that his Fifth Amendment rights were violated when the prosecutor cross-examined him during his trial regarding his prearrest silence in order to impeach his credibility. The Court held that such

10

cross-examination did not violate the Fifth Amendment. It expressly refused to decide the application of the Fifth Amendment to prearrest silence, stating, "Our decision today does not consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Id*. at 236 n.2. The Supreme Court has still not decided that issue. In *Portuondo v. Agard*, the Court said, "The [*Jenkins*] Court noted that it was not clear whether the Fifth Amendment protects prearrest silence." 529 U.S. 61, 70 (2000). However, in *State v. Moore* this Court stated, "We believe the better rule is that which holds that the defendants' Fifth Amendment right not to have their silence used against them in a court proceeding is applicable pre-arrest and pre-*Miranda* warnings." 131 Idaho 814, 820, 965 P.2d 174, 180 (1998). The right against self-incrimination in the Fifth Amendment applies "only when the silence is used solely for the purpose of implying guilt." *Id*. at 821, 965 P.2d at 181.

The first challenged testimony was that Defendant did not acknowledge that he was Darin Parton and that the driver's license located by police in his bedroom was his. Defendant does not argue how this testimony was for the purpose of implying guilt due to Defendant's refusal to identify himself. Defendant only argues that "it is difficult to imagine the relevance of testimony concerning whether Mr. Parton ever acknowledged a driver's license found in his wallet containing his photograph was his." Although we agree that the relevance of that testimony is questionable, arguing that the testimony was irrelevant is not the same as arguing that it was used solely to imply Defendant's guilt from his silence. It could simply imply that he was angry to be awakened by police officers in his bedroom and then handcuffed.

The second challenged testimony was the officer's answer as to why he arrested Defendant. He said, "Just based on [the woman's] statements, her injuries and his lack of statements to us, telling us exactly what happened." Defendant argues that this testimony "resulted in [the officer's] statement about Mr. Parton's 'lack of statements' helping to provide probable cause for his arrest." The State counters that this testimony "regarding the reason for arresting Parton was just that - a statement about why Parton was arrested. It was not a statement intended to imply guilt from Parton's failure to provide his version of events."

The State does not explain why the officer's reason for arresting Defendant would be admissible. The testimony was obviously offered solely to show that an accused's failure to offer a statement about the allegations is properly considered in deciding whether the accused committed the crime alleged. Although an officer at the scene may consider the accused's

failure to rebut the accusations when deciding whether to arrest, there is no showing why the officer's analysis in deciding who to arrest is admissible at trial. The obvious purpose of the testimony was to convince the jury that they should apply the same analysis as the officer did and consider a defendant's failure to offer an explanation when deciding guilt. As such, it violated Defendant's Fifth Amendment rights.

The next challenged testimony was the deputy prosecutor's questioning of the second officer to testify about a conversation with Defendant while he was being transported to jail. The questions and answers were as follows:

> Q. Did you make any further statements at that time to investigate or ask him questions about what had happened?
> A. Yeah. I read him his Miranda rights. I tried. It seemed like every sentence he would interrupt, that he would make statements, again, that didn't make any sense, that weren't coherent most of the time. Once I got through reading his rights, asked if he understood them, and he didn't answer the question. So I didn't question him at that time.
> Q. And that's because he wouldn't acknowledge that he understood his rights?
> A. Yes, correct.
> Q. Were you in the vehicle that took him to the jail?
> A. I was.
> . . . .
> Q. And did he make any statements on the way to the jail?
> A. He did.
> Q. Tell the jury about those.
> A. He stated that he wanted to know what was going on. We'd told him several times up to this point what had been taking place, but he asked again, and I said because he didn't understand his rights that I wasn't going to talk to him. And at one point, he said he understood his rights and wanted to know what was going on, which at that point, I explained being arrested for domestic battery. And I believe he said that nothing happened, at which point I said, "Do you remember beating up your girlfriend?" And at that time, he said he wanted his attorney, and so I stopped asking him questions at that time.

The deputy prosecutor elicited testimony that after the defendant had been given his *Miranda* rights and was asked "Do you remember beating up your girlfriend?," he refused to answer the question and asked for an attorney. The State argues, "The prosecutor merely asked the officer to tell the jury what 'statements' Parton made on the way to the jail. She did not ask him to explain the circumstances surrounding the statements."

12

The officer was called as a witness by the deputy prosecutor. She presumably asked whether Defendant had made any statements on the way to jail because she knew the statements he had made. She did not seek to limit the officer's testimony, but asked whether Defendant made *any* statements, and then asked the officer to tell *them* to the jury. She presumably knew that Defendant had asked the officer what was going on and then stated nothing happened when the officer told him he had been arrested for domestic violence. Those statements may have been relevant to impeach Defendant if he later testified to some version of what occurred, but he had not yet testified and did not testify. The obvious purpose of the deputy prosecutor's question was to have the officer testify as to Defendant's third statement—asking for an attorney when confronted with the allegation that he had beaten his girlfriend. As such it violated his Fifth Amendment Rights.

During the deputy prosecutor's closing argument, she argued:

> Despite, essentially, the perjury that she committed at the preliminary hearing in this case, the reasons to believe [the woman] far outweigh the reasons not to believe her.
> We also have the option to believe the defendant. At the scene, he was inconsistent. He told [the officer], first, that he didn't do anything, and then that he didn't remember anything. Well, which one is it? You either didn't do anything or you don't remember. Which one?
> He didn't acknowledge or provide any explanation for the significant injuries to his face. And you saw those pictures. Those are significant injuries that he had.

Defendant contends that his Fifth Amendment rights were violated by the argument that he "didn't acknowledge or provide any explanation for the significant injuries to his face." The second officer to testify stated that at the jail, "we noticed them [Defendant's injuries] in the light when he was getting his handcuffs taken off." They then took photos to show the injuries. As he was explaining the photos to the jury, he stated that "we had to actually talk to him to convince him to take photographs of his injury." He also stated, "We explained everything in his best interest, that he, in fact, had injuries." Thus, in the context of the testimony, the deputy prosecutor was pointing out that Defendant failed to offer an explanation for his injuries when they were pointed out to him at the jail. At this point, he had been arrested and given his *Miranda* rights. Commenting on his silence violated his Fifth Amendment rights. *Doyle v. Ohio*, 426 U.S 610, 619-20 (1976).

13

**(2) Whether the error was clear or obvious.** The second prong of the *Perry* analysis is that "the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision." *Perry*, 150 Idaho at 226, 245 P.3d at 978. With respect to this prong, Defendant asserts, "considering the clarity of the law on this subject, along with the fact that there could have been no reasonable strategic basis for defense counsel not to have objected, it is clear that the error was plain." In response, the State asserts that Defendant's trial counsel may have declined to object because he did not think the testimony was objectionable or he was sandbagging. If, as posited, defense counsel did not realize the impropriety of the deputy prosecutor's actions, ignorance of the law is not a tactical decision. With respect to the possibility of sandbagging, the State does not offer any reason to suspect that may have occurred. We need not address whether that was a possibility because Defendant has failed to show that the error affected his substantial rights.

**(3) Whether the error affected Defendant's substantial rights**. The third prong of the Perry analysis is that "the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings." *Id.* In support of the third prong, Defendant's entire argument is as follows:

> Considering the final prong, whether there is a reasonable possibility that the misconduct affected the verdict, the weaknesses in the State's case, as noted in sections I and II (including the complaining witness' admitted perjury in an earlier proceeding in this case), as well as the fact that Mr. Parton did not testify at trial, establish that the three references to his exercise of his Fifth Amendment rights could reasonably have affected the verdict.

Defendant first asserts that harm was shown "by the weaknesses in the State's case, as noted in sections I and II (including the complaining witness' admitted perjury in an earlier proceeding in this case)." In section I of Defendant's opening brief, he argued that the district court erred in permitting the detective to testify as an expert, and in section II he argued that the court erred in ruling that the woman's initial statement to the police officers was an excited utterance. Neither of those were weaknesses in the State's case, nor were the court's rulings erroneous.

Defendant then states that the woman "admitted perjury in an earlier proceeding in this case." She admittedly testified falsely at the preliminary hearing in an attempt to get the charges

14

dismissed against Defendant, and during the trial she explained she did so "[b]ecause he had such control over me, and I felt intimidated." On cross-examination, she testified to what parts of her preliminary hearing testimony were true and what parts were false. The State also offered testimony from an expert regarding the dynamics of domestic violence from the victim's perspective. Defendant does not explain why the fact that the woman testified falsely during the preliminary hearing in order to help Defendant showed that the State's case at trial was weak.

Finally, Defendant points out that he did not testify at the trial. That fact does not show that the State's case was weak, nor does Defendant explain why his decision not to testify would show that the deputy prosecutor's actions affected his substantial rights.

Constitutional errors in the setting of a particular case may be so unimportant and insignificant that they are deemed harmless. *Chapman v. California*, 386 U.S. 18, 22 (1967). To show that the errors affected Defendant's substantial rights requires at least an examination of the evidence presented and the overall strength of the State's case. *State v. Hooper*, 145 Idaho 139, 146, 176 P.3d 911, 918 (2007). Such an examination is lacking in Defendant's argument. Therefore, he has not shown that the errors affected -the outcome of the trial.

## V.

### Is Defendant Entitled to a New Trial Under the Cumulative Error Doctrine?

Defendant contends that he is entitled to a new trial under the cumulative error doctrine. Under that doctrine, "a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *Perry*, 150 Idaho at 230, 245 P.3d at 982. As discussed above, the only errors were not shown by Defendant to have affected his substantial rights. Therefore, he is not entitled to a vacation of the judgment under the cumulative error doctrine.

## VI.

### Was There Sufficient Evidence Supporting the Jury's Finding that Defendant Was a Persistent Violator?

The jury found that Defendant was a persistent violator based upon a judgment out of Pierce County, Washington, for the crime of assault in the third degree and a judgment out of Canyon County, Idaho, for two counts of the crime of possession of a controlled substance with

intent to deliver.[1] Defendant contends that the Washington judgment was insufficient to prove that it was he who committed the crime. The judgment stated that the defendant was "Darin William Parton" and that his date of birth was "08/31/71." Defendant contends that the second officer who testified stated that Defendant's "date of birth is either August 30 or 31, 1971" and then argues that "a judgment of conviction containing merely the same name and a possible date of birth match" is insufficient to sustain the verdict.

The officer did not testify that Defendant's date of birth was "either August 30 or 31, 1971." During the trial, the police officer initially testified that Defendant's date of birth was "8/30, I believe, of '71," but he was then permitted to read from his report and stated that Defendant's date of birth was "8/31 of '71." Thus, Defendant's argument is simply that, as a matter of law, the same name and same date of birth are not sufficient to prove that Defendant was the person convicted in the Washington judgment.

"This Court will not overturn a judgment of conviction, entered upon a jury verdict, where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt." *State v. Sheahan*, 139 Idaho 267, 285, 77 P.3d 956, 974 (2003). "We view the evidence in the light most favorable to the prosecution, and we do not substitute our judgment for that of the jury regarding the credibility of the witnesses, the weight of the evidence, and the reasonable inferences to be drawn from the evidence." *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007). Evidence is substantial if a reasonable jury could have relied upon it in determining that the allegation was proved beyond a reasonable doubt. *State v. Anderson*, 145 Idaho 99, 103, 175 P.3d 788, 792 (2008).

The Washington judgment was admitted without objection. The name of the defendant on the judgment was "DARIN WILLIAM PARTON" and his date of birth was "08/31/71," which are identical to Defendant's full name and date of birth. No contradictory evidence was presented, nor was there any argument that Defendant had a common name. The jury was not required to reach its verdict beyond any possible doubt. It was only required to conclude, beyond a reasonable doubt, that the Darin William Parton named in the Washington judgment

---

[1] In *State v. Brandt*, 110 Idaho 341, 344, 715 P.2d 1011, 1014 (Ct. App. 2011), our Court of Appeals held that "convictions entered the same day or charged in the same information should count as a single conviction for purposes of establishing habitual offender status." The State has not challenged that holding.

16

was the same Darin William Parton on trial in this case.  The jury's verdict finding that it was is supported by substantial evidence.

## VII.
## Conclusion.

We affirm the judgment of the district court.


Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**